CENTRAL TRUST CO. *v.* FLORIDA RY. & NAV. CO., (HAWKINS, Intervenor.)

*(Circuit Court, N. D. Florida.* August, 1890.)

1. JUDGMENT—VALIDITY—PARTIES.
   Where a railroad has been mortgaged to secure bonds which have been guarantied by the state, a decree that a certain branch of the road is not subject to the mortgage lien is of no validity when made in a suit in which the bondholders are not represented, and of which the state has not been notified, and which is brought in a county in which no part of said branch road is situated.
2. MORTGAGE FORECLOSURE—NOTICE.
   Notice, at a foreclosure sale, of an adverse claim under an invalid decree of court does not affect the purchaser's title.

In Equity. Petition for intervention.

SPEER, J. This is an intervention in a bill where the complainants are trustees under deeds of trust made to secure a large amount of bonds issued on the railroad of the defendant company, to-wit, the Florida Railway & Navigation Company. This company was incorporated under a general act of the legislature of the state of Florida. It issued six million of bonds, with the deed of trust above mentioned to the Central Trust Company of New York. By the bill, in which the intervention before the court is presented, there was obtained a decree and a judicial sale of the entire line from Chattahoochee to Jacksonville. There were also sold the branch roads to St. Marks and Monticello. Upon the last —a short road—this controversy depends,—the road from Fernandina to Cedar Keys and Waldo to Wildwood, and afterwards built to Plant City, with extension to Tavares, upon which there was an issue of underlying bonds. The Florida Central & Western Railroad was also organized under a general act. They likewise issued bonds on 234 miles of railroad from Chattahoochee to Jacksonville, with branches to St. Marks, to Tallahassee, and Monticello to Drifton, 202 miles. Eight hundred and eight thousand dollars of the bonds—$12,000 a mile—were issued in March, 1881, and a deed of trust to secure the payment of the same was made to the Guarantee Trust & Safe-Deposit Company. The Florida Central & Western Railroad was formed by a combination of the lines of two companies, which were subject to foreclosure and sold, as appears in the case of Schutte against the railroad company and others; the decree having been rendered on May 31, 1879, and the sale having been made in 1881. The roads were as follows: (1) The Florida Central Railroad Company, 60 miles, from Jacksonville to Lake City; (2) the Jacksonville, Pensacola & Mobile Railroad Company, Lake City to Chattahoochee, with the branches above mentioned. There was also an issue of bonds to the state of Florida for four millions of dollars for the benefit of the Florida Central Railroad Company. These bonds were issued in exchange of three million dollars of bonds of the latter company, and one million additional, which were issued under the acts of June, 1869, and January, 1870, (chapters 1716, 1731 of the Laws of Florida.) These

bonds gave to the state of Florida a statutory lien upon the last-mentioned road. The bonds were issued on the 1st day of January, 1870. The Jacksonville, Pensacola & Mobile Railroad company was organized under a special act, and, being authorized so to do by the terms of the act, (chapters 1716 and 1731 of the Laws of Florida,) consolidated with its line other roads or parts of roads from Quincy to Lake City, from Tallahassee to St. Marks, and the particular branch in controversy here, from Drifton to Monticello. These lines were owned by the Tallahassee Railroad Company. The lines were absorbed by the Jacksonville, Pensacola & Mobile Railroad Company under the authority just mentioned. The Tallahassee Railroad Company, by virtue of the act of June 24, 1869, (chapter 1718 of the Laws of Florida,) was an organization of the purchasers, who bought on the 20th of March, 1869, at a sale made by the trustees of the internal improvement fund of Florida, the Pensacola & Georgia Railroad and the Tallahassee Railroad. The Pensacola & Georgia Railroad Company was organized under a special enactment made in January, 1853, (see chapter 484 of the Laws of Florida, McClel. Dig. 1048.) It was authorized to build a railroad from the city of Pensacola to a point on the Georgia line. Its charter was amended December 15, 1855, (chapter 728, Id.,) so as to conform to the act of January 6, 1855, which is generally known as the "Internal Improvement Act." By the same amendment certain branches were provided for, and amongst them a branch from Drifton to Monticello, four miles in length.

After the amendment to its charter referred to in the preceding paragraph, the Pensacola & Georgia Railroad Company accepted for itself the operative provisions of the internal improvement act. As a consequence this company became entitled to receive from the state on so much of its main lines, extension, and branches as conformed to the lines specified in section 4 of the improvement act the state aid and benefits derivable therefrom. These were indorsement by the state of its bonds, the guaranty of interest on the same, grants to alternate sections of state lands, exemption from taxation, and the personal exemption of its employes from the duty to serve on the militia, on the juries, and to work the roads. They were entitled to receive also alternate sections of such lands as might be thereafter granted by the general government. It was provided also that it should have the aids and benefits of these land grants on so much of the line as did not conform to the route indicated in the fourth section of the internal improvement act. In consideration of these benefits it assumed certain obligations to the state. These related to the character of road construction, of the application of the proceeds of their indorsed bonds as directed,—the payment to certain sinking funds. For all payments made by the internal improvement fund they were to turn over an equivalent amount of stock, the maps of their lines were to be deposited, and in further consideration of this performance on their part they became entitled to exclusive privileges from competition for 20 miles on either side of their lines of railway. A more important consideration moving from them to the state

for the vast franchises which were granted to them was this . The Pensacola & Georgia Railroad Company created, upon their acceptance of the provisions of the act, a mortgage on all its franchises, road-bed, workshops, iron, equipments, and depots, so that, upon a failure of the company to pay interest and the amount due to the sinking fund for 50 days, the trustees of the internal improvement fund could, by virtue of the mortgage or lien just referred to, seize and sell the property covered thereby. This result soon followed. The railroad company failed to comply with the conditions of their obligation, and the trustees of the internal improvement fund seized, advertised, and sold the assets above mentioned, under the provision of the act of March 30, 1869. They were purchased by one Dibble and his associates. The purchase included the entire road and the branch now in controversy, and was thereafter incorporated into the Tallahassee Railroad Company, and consolidated with the Jacksonville, Pensacola & Mobile Railroad. Having been mortgaged to the state of Florida under the statutory liens of June, 1869, and of January, 1870, it was sold for the satisfaction of the Schutte decree under the lien of said mortgage, and was incorporated into the Florida Central & Western Railroad Company in March, 1880, and was bonded and consolidated into the Florida Railway & Navigation Company in March, 1884, and was again bonded. All of these changes of organization and title included the branch from Drifton to Monticello, it having passed under the operation of the several liens, and, in connection with the main line, at the sale of March 20, 1869. By a disreputable trick the purchasers got possession of the Pensacola & Georgia Railroad Company by paying a portion of the purchase money and by substituting a worthless check for the balance. They at once proceeded to cover the road and the branch in question with the lien of the state bonds of January 1, 1870. In subsequent litigation to collect the balance of the purchase money and to enforce the lien of the internal improvement bonds, the question was presented whether this branch road was covered by the lien of the trustees of the internal improvement fund, and it has been uniformly held in the affirmative. *Internal Imp. Fund* v. *Jacksonville, etc., R. Co.*, 16 Fla. 708; *Holland* v. *State*, 15 Fla. 456; *State* v. *Anderson*, 91 U. S. 669; *Railroad Co.* v. *Schutte*, 103 U. S. 129; Decision of BRADLEY, justice of the fifth circuit court of the United States for Florida, in *Schutte* v. *Railroad Co.*, 3 Woods, 692, decided in May, 1879.

It is insisted upon the part of the defendant company that their title to the branch road for the foregoing reasons is perfect. This is not only true, they insist, by correct construction of all the enactments and contracts in question, but also by definite and final adjudication. They insist that, if it were an original question, the court must hold that the Pensacola & Georgia Railroad Company was an indivisibility; that its franchises covered its branches as well as its main line; that by the acceptance of the internal improvement act it put all of its railroad, whether on the main line or in the branches, under the operation of the act, and that its subsequent seizure and sale by the trustees acting under

that act because of the default of the company vested in the purchasers complete and perfect title; and they call attention to what seems indisputable, that the branch was sold with the main line under the statutory lien, and they insist that this concludes all second and junior incumbrances. For the intervenor it is insisted that the decree of the state court has adjudicated that the branch from Drifton to Monticello was not subject to the lien of the internal improvement bonds. The intervenor prays that the receiver be required to bid at a sale of the said branch road from Drifton to Monticello to the amount of its value, which shall be estimated by a master. The fund to be realized from this bidding he claims—*First.* Under the deed of trust from the Pensacola & Georgia Railroad Company, dated in 1860, conveying the lands and so forth to trustees, and providing for the issue of certain bonds, the same to be a first lien on the lands, and a second mortgage on the railroad, its franchises, etc. This deed of trust was recorded in Jefferson county, where this branch is wholly situate, in February, 1870. *Second.* By reason of a judgment under a code of practice then in force in Florida, which judgment was obtained in the circuit court of Leon county in a proceeding there pending between the trustees, who are now represented by the intervenor, and others on the one part, and the Jacksonville, Pensacola & Mobile Railroad on the other part. This judgment was obtained in 1872 or 1873. *Third.* He insists that the notice of this alleged lien was given at the sale under the Schutte decree by a Mr., Lewis, through Mr. George P. Raney. The original deed of trust, under which the intervenor claims, was made to Bailey & McGhcehee, and was recorded on the 5th day of February, 1870, before the said bonds were sold. This, it is insisted, gives to that deed of trust a priority over any title acquired under the sale of the state bonds by virtue of the internal improvement lien. To the argument of defendants that there was no lien recorded in Jefferson county, in which the branch road in question is wholly situate, they insist that the deed of trust to Lewis and Hawkins is there recorded on all the property of the Pensacola & Georgia Railroad Company, and the branch to Monticello was a part of the property when the deed of trust was executed. They insist, further, that the bonds issued under the internal improvement act attached only as a lien to that portion of the Pensacola & Georgia Railroad and its property mentioned in the statute, and that the branch to Monticello was not therein included. They insist, therefore, that Lewis and Hawkins, the latter of whom is the intervenor, have the only lien on this branch. They insist there was no necessity for record of this lien. They insist that the action of the governor of Florida and the trustees of the internal improvement fund was wholly illegal, and that the intervenor and those whom he represented were not estopped upon failure to protest against the sale by the state authorities. They insist that the lien enforced by the sale under the decree in the *Schutte Case* was immaterial, as the decree in that case was rendered without reference to the rights or interests of the persons whom the intervenor represents; they insisting that, the state courts having taken jurisdiction of the subject-matter, the federal court would not presume to

interfere.   They insist that the confirmation of the sale by the federal court did not have the effect to nullify the decree of the state court to the effect that the lien of the internal improvement fund did not attach to the branch between Drifton and Monticello.

In reply to the argument that the railroad company dismissed its bill against the intervenor's rights in the state court of Escambia county for the reason that the intervenor had sought the jurisdiction of this court, the intervenor insists that his purpose by the intervention was to prevent a conflict of jurisdiction, and not to try any question of title or lien in this court, as the receiver of the company can claim nothing here more than could have been claimed by the Florida Railway & Navigation Company.   That company having dismissed its bill in the circuit court of Escambia county, the receiver is estopped from setting up any rights against the claim of petitioner in this court.   The receiver is governed by the action of the Florida Railway & Navigation Company in dismissing its bill; he has no concern in the matter.   The record in Escambia county estops him.   To the point made by defendants that Hawkins, now the intervenor, was receiver of this court, and conducted the sale of the Jacksonville, Pensacola & Mobile Railroad in the *Schutte Case*, the intervenor insists that, while Hawkins, with his co-receiver, did conduct the sale, a notice of the decree in favor of the intervenor was given at that sale before the bidding, that notice being that any person purchasing the railroad from Monticello to the junction at Drifton would take the same subject to the lien of the decree in the state court in favor of the trustees of the Freeland bonds; that neither Hawkins nor any person acting with him, who was interested in the decree of the state court, was impleaded in the *Schutte Case*, and hence the decree in that case in no wise affected their interest.   To the argument of the defendant that neither the petitioner nor any of his purchasers have been in possession of the branch to Monticello, and that the Pensacola & Georgia Railroad Company built it, and always had possession of it until sold by the trustees of the internal improvement fund, and that it has passed to several subsequent purchasers since that sale, the intervenor insists that, while this branch did belong to the Pensacola & Georgia Railroad, it was not covered by the lien of the Pensacola & Georgia Railroad bonds, which were indorsed by the trustees of the internal improvement fund.   That it was conveyed as a security for the payment of the Freeland bonds, and that the trustees of those bonds were prompt in asserting their lien.   They had the first sale set aside by a decree of the state court.   They gave notice of the decree by a subsequent sale.   That subsequent attempted sales have been provided, and that notice to said trustees of the decree in the state court has always been notice, not only of their lien, but of its recognition and enforcement by a court having jurisdiction.

The court has considered the arguments and briefs of the solicitors, and has examined the voluminous records in evidence, with very great care. It has thus reached the conclusion that the liens of the state bonds of January 1, 1870, covered the branch road from Drifton to Monticello, and this branch was lawfully sold by the trustees of the internal im-

provement fund. This view has received apparently the conclusive sanction of the supreme court of the United States in the case of *Railroad Cos.* v. *Schutte*, 103 U. S. 120. The recital in the language of the chief justice is as follows:

"The Florida, Atlantic & Gulf Central Railroad Company, incorporated by the general assembly of Florida in 1853, built a railroad from Jacksonville to Lake City. The Pensacola & Georgia Railroad Company, also incorporated during the same year, built a road from Lake City through Tallahassee to Quincy, in the direction of Mobile, with a branch to Monticello; and the Tallahassee Railroad Company, incorporated at a somewhat earlier date, built another road from Tallahassee to St. Marks. Each of these companies became indebted to the state of Florida under the provisions of the internal improvement law; and, as a consequence, the road of the Florida, Atlantic & Gulf Central Company was sold on the 4th of March, 1868, by the trustees of the internal improvement fund, under the authority of law, to William E. Jackson and his associates; that of the Pensacola & Georgia Company on the 6th of February, 1869, to F. Dibble and his associates; and that of the Tallahassee Company on the same day and to the same parties."

See, also, *State* v. *Anderson*, 91 U. S. 669; *Internal Imp. Fund* v. *Jacksonville, etc. R. Co.*, 16 Fla. 708; *Holland* v. *State*, 15 Fla. 456.

We find that the Pensacola & Georgia Railroad Company had authority by its charter to build and operate the branch in question, (see Mc-Clel. Dig. p. 1056, § 31;) that the Pensacola & Georgia Railroad Company was incorporated with the Jacksonville, Pensacola & Mobile Railroad Company; and that by the acts of Florida June, 1869, and the amendment of January, 1870, the statutory lien was created that all bonds issued by the railroad company under this legislation were made a first mortgage or lien on the road-bed, iron, equipment, work-shops, depots, and franchises, (McClel. Dig. p. 590, § 3;) that the holders of the bonds in a decree obtained authority for the sale of the road and the branch in controversy under the statutory lien of 1869; that in the same decree the trustees of the internal improvement fund were authorized to sell to recover the unpaid purchase money due by virtue of the sale under the internal improvement act; that this decree applied as well to the particular branch in controversy as to the entire road; and that the complainants, who are the bondholders under the acts of June, 1869, and January, 1870, in February, 1882, by regular procedure caused the sale of the road and the branch from Monticello to Drifton. The Florida Railway & Navigation Company went into possession under conveyances of February, 1882. The latter company, we further find, issued the bonds and deeds of trust which have been enforced upon the main line and as well upon the particular branch in the several causes in which this intervention is made. These findings are ascertained from the bill in the *Schutte Case* and the decree thereon, and certified copies of the reports of the masters A. B. Hawkins and S. Conant. We find further that the deed of trust from the Pensacola & Georgia Railroad Company, made to William Bailey and John C. McGeehee on April 1, 1860, which invested the said trustees with a lien on said railroad, including said branch, was second in dignity to the lien under the internal improve-

ment act, but was a first lien on all other property of the Pensacola & Georgia Railroad Company; that this deed of trust was recorded in Jefferson county, Florida, on the 5th day of February, 1870, in which county the said branch road is wholly situate. We find further that a decree was rendered in the circuit court of the second judicial circuit of Florida in and for Leon county, in a cause wherein Benjamin C. Lewis and Alexander B. Hawkins, as trustees for the bondholders of the Freeland bonds, issued by the Pensacola & Georgia Railroad Company, and John McDougall and the said Benjamin C. Lewis in their own rights, were plaintiffs, and the Jacksonville, Pensacola & Mobile Railroad Company, John G. McGeehee, trustees for the holders of the Freeland bonds issued by said Pensacola & Georgia Railroad Company, Richard A. Whitfield and William M. Miller, administrators of John Miller, deceased, and others were defendants; that this proceeding was under the practice known as the "Code Practice," then in force in the state of Florida; that the question of law raised by the pleadings was passed upon, and the court then decreed that the said branch road was not covered by the liens in favor of the bonds issued under the internal improvement act, and that the sale by the said trustees of August, 1869, did not pass the branch road, and did not carry with it the sale of the said branch road, and that the branch road was subjected to the liens of the bonds represented by the petitioner as trustee, and that the legal title to the said branch was, at the time of said decree, in the trustee for the benefit of the said bondholders; that at the sale of the said Pensacola & Georgia Railroad and branch, made under the Schutte decree by the petitioner and another as masters, in 1879, notice was given by B. C. Lewis that any person purchasing this said branch would take the same subject to the lien of said decree and the lien of the bonds issued thereunder and then outstanding, amounting to several thousand dollars; that this decree was never recorded in the circuit court records of Jefferson county; that no judgment roll was ever filed with said decree in the proper court, either of the county of Leon or Jefferson. We further find that the Pensacola & Georgia Railroad Company, by bill filed for that purpose in the Leon circuit court and transferred to the circuit court of Escambia county, Florida, enjoined the sale of said branch road as advertised to be made by the decree of the circuit court of Leon county as aforesaid; that the defendants answered said bill for injunction; that afterwards, on the 9th day of February, 1886, the petitioner intervened in this court, praying therein, among other things, that the receiver pay into this court the sum of $40,000, as the estimated value of said branch, and for such other and further relief as the court might deem the petitioner entitled to; that leave was granted to file said petition, and the petitioner became an intervenor in this suit; that afterwards, and on the 6th day of March, 1886, the Florida Railway & Navigation Company dismissed their bill for injunction, then pending in the Escambia circuit court; that the petitioner subsequently filed his amended petition, and therein prayed for an allowance to make a sale under the decree of the circuit court of Leon county, and that the receiver be directed and required to bid at said

sale such an amount as shall be ascertained by a commission of this court to be the value of said branch, and for other and general relief; that to this petition and amended petition the receiver in this cause made answer, and that upon the issue joined the several parties have filed record evidence and depositions, upon which the foregoing facts are made to appear.

With relation to the reasons presented for the relief they seek by the solicitors for the intervenor the court has reached the following conclusions: The notice given by the counsel representing the interest of the intervenor at the sale under the decree in the *Schutte Case* appears to have been superfluous, and without legal effect. It was a judicial sale, and the purchaser must have bought with notice of the existence of all previous valid incumbrances. It is insisted in the able and elaborate brief of Mr. Henderson that the solicitors who gave this notice represented also clients who, under the decree of sale, had a first lien on the property with relation to which he gave the notice of an adverse trust. That, besides that, one of the trustees who was making the sale was the co-trustee with Lewis for the interest concerning which the notice was given, and that Lewis himself was a party defendant to the suit of Schutte against the railroad companies, in which the decree was rendered; and he urges for these reasons that there was no virtue in this notice. These considerations, were it indeed practicable to evolve from the cumbersome record their merit or their refutation, we would regard as of minor importance. The notice was given to call the attention of purchasers to a judgment of the court of Leon county, which, if binding on the parties, was itself notice to the world. If invalid, the notice could not give it validity; and we are clearly of the opinion that the circuit court of Leon county had neither jurisdiction of the persons nor of the subject-matter involved in the litigation. The suit was begun long after the date of the Florida state bonds, (January 1, 1890,) and even long after their actual issue; and under the authority of *Ketchum* v. *St. Louis*, 101 U. S. 306, we think not only the trustees of the internal improvement fund, but the bondholders under the act of 1870, or their sufficient representative, were necessary parties. See, also, Story, Eq. Pl. § 178, note; *Williams* v. *Bankhead*, 19 Wall. 563. This was an exceptional case. The sovereign state of Florida had issued its bonds, having contingent liens on all their property. It was a matter of public notoriety that these bonds were in the hands of holders for value, and if it was contemplated to sell a valuable portion of the property, not merely the equity of redemption, and thus divest the lien of the state as well as the rights of the bondholders who had invested with confidence in the validity of its obligations, the case would seem to stand on a different footing from the ordinary controversy between prior and junior mortgages. The subsequent crop of litigation abundantly shows this. There were many things to be settled before the judgment of the circuit court of Leon county could be regarded as conclusive. The state of Florida would not have been made party against its will, but it might have intervened and protected its interest, had proper notice been given. *Elliot* v. *Van Voorst,*

3 Wall. Jr. 299. There was no notice given in this case in the state court, and none of the incumbrances were represented. Besides, it seems that Jefferson county had exclusive jurisdiction of the proceeding so far as it was justified by the trust-deed of 1860. Either the branch road from Monticello to Drifton was independent of the main line or a part thereof. If a part of the main line, it was clearly subject to the lien of the internal improvement bonds. If an independent line, it was wholly within Jefferson county; and it would seem that a proceeding to sell the road would not have been maintainable in Leon. Code Proc. Fla. § 74, Bush. Dig. 477; McClel. Dig. p. 766, § 5; *Railroad Co.* v. *Rothschild*, 26 Amer. & Eng. R. Cas. 57. The judgment of a court without jurisdiction of the parties or subject-matter is void, nor could the right of the bondholders be affected by the acquiescence of their debtors without their consent. This judgment in Leon county seems to have been obtained by default. The recital that "it appears from the allegation of the complaint, and not denied in the answer," etc., indicates as much. It is nevertheless recited in the complaint on which the judgment was taken in Leon county that the Pensacola & Georgia Railroad Company was authorized to construct a branch road to the county seat of Jefferson county; that this was done on the 5th day of December, 1855; that on the 10th of the preceding February the Pensacola & Georgia Railroad gave notice to the trustees of the internal improvement fund of their acceptance of its provision; that the said branch line was seized and sold by said trustees. The complaint further recites that the Pensacola & Georgia Railroad bargained, sold, and conveyed the depots, franchises, and equipments of said road to Bailey and McGehee in the event of the payment of the Freeland bonds, and in default of the payment of the said Freeland bonds for three months the trustees should have the power to take possession of said road-way, depots, stations, franchises, and equipments of said company without any judicial or preliminary process whatever, and the same to sell, lease, or otherwise dispose of, as in their discretion they may deem best for the interest of the bondholders. It recites further that that the said McGehee as trustee, the said Pensacola & Georgia Railroad acquiescing therein, did convey to Alexander B. Hawkins and Benjamin C. Lewis large bodies of land, to be held upon the same uses and trust as the same were conveyed to the said Bailey and McGehee by the said Pensacola & Georgia Railroad Company. The complaint points out a doubt on the part of the said McGehee as to whether he did divest himself of the legal ownership of the road-way, depots, stations, franchises, and equipment of the said Pensacola & Georgia Railroad Company. This doubt on the part of Mr. McGehee seems to be not entirely without foundation. The rights of the public in railroad corporations and their franchises created and granted for the public welfare have been defined with great distinctness since the date of this conveyance to Bailey and McGehee in 1860. It is not now regarded that to sell out and part with the title to its franchises is an ordinary and usual function of a railroad company. The power to lease a railroad, its appurtenances and franchises, is not to be presumed from the usual grant of power in a railroad

charter; and, unless authorized by a legislative action so to do, one company cannot transfer them to another company by lease, nor can the other company receive and operate them under such lease. *Oregon R. & Nav. Co.* v. *Oregonian R. Co.*, 130 U. S. 1, 9 Sup. Ct. Rep. 409. Whether or not this doctrine is applicable to the case at bar, it would seem indisputable that, if an important part of the claim in the Leon county case was on account of the foreclosure proceedings of the trustees of the internal improvement fund, they were indispensable parties, and a decree without them would be a nullity.

It is insisted, besides, with great confidence, before the judgment in Leon county could be a valid lien on real estate situate in Jefferson county it must have attached thereto a judgment roll, and must be recorded in the county where the real estate is situate. Code Proc. Fla. §§ 45, 46, 227, Bush. Dig. 469, 516; McClel. Dig. 619. It is insisted further that this has never been done. On the argument of this cause at Jacksonville the judgment roll was not produced, but since that time, and while the court has had the case under advisement, a certified copy of this paper has been forwarded the court, it having been discovered by the Honorable ——— RANEY, who was formerly of counsel in the cause. It does not appear, however, to have been recorded in Jefferson county; but, without passing on the technical question involved, which is necessarily unfamiliar to one unacquainted with the local laws of the state, and merely stating it for the benefit of all concerned, we prefer to rest our opinion upon the want of jurisdiction of the Leon county court, and the want of indispensable parties, before adverted to. It would be indeed a serious matter if a title perfected by the decrees of the United States courts, by which all parties at interest were bound, could be unsettled by a judgment by default in a county of the state where the property was not situate, and where indispensable parties were not made.

For the foregoing reasons the court is compelled, in its opinion, to deny the application of the intervenor. The present purchasers, who have succeeded to the rights and equities of the purchasers under the Schutte decree in 1879–81, obtained on the road and this branch a first lien for the trustees of the internal improvement fund on bonds authorized to be issued in 1855, and a subordinate lien second only to that last above mentioned in favor of the holders of $2,800,000 of the Florida state bonds bearing date and lien as of January 1, 1870. They also acquired under the sale of March 20, 1869, all the rights of the trustees of the internal improvement fund in and to the Pensacola & Georgia road and this branch. We gravely doubt whether the Pensacola & Georgia Company had the power to pledge their entire assets and franchises to the trust which the intervenor represented. They were authorized to borrow money to carry into effect the object of their charter, to issue certificates or other evidences of such loan, and to pledge the property of said company for the payment of the same and the interest. These powers were never enlarged. This is far short of a power to execute a conveyance which stipulates that in the event of the default in the payment of the interest or principal which shall have remained in arrears for the

space of three months the creditor shall have power to take possession of the said railways, depots, stations, franchises, and equipments of said company without any judicial or other preliminary process whatever, and the same to sell or lease or otherwise dispose of, as in their discretion they may deem best for the interest of the bondholders. The application of petitioner is refused, and the intervention is dismissed at the cost of the intervenor, and the decree of the court will be framed accordingly.