# KNEELAND *v.* LUCE. (2)

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF INDIANA.

No. 39. Argued October 19, 20, 1891. — Decided November 9, 1891.

In a suit in equity brought against a railroad company, by a judgment creditor, for the sale of its road, because of insolvency, the road being covered by numerous mortgages, a receiver was appointed, on whose petition an order was made directing him to issue receiver's certificates to various parties, who claimed to be sub-contractors for building the road, and were about to sell certain shares of the stock of a company whose road formed part of the line of road and were held in pledge for the debts. The order directed that the certificates should be a first lien on a certain part of the road and should so state on their face. They were so issued. The trustee in the mortgages was a party defendant to the suit, when the receiver was appointed, and, by its counsel, consented to the issue of the certificates. The trustee also filed a foreclosure bill, in which a decree of foreclosure and sale was made, providing for the payment of " court and receiver's indebtedness," prior to the payment of the bondholders, and gave leave to the purchaser at the sale to appeal from any order directing the payment of claims as prior to the mortgage bonds. The road was sold, and the purchaser, under the order of the court, received the shares of stock referred to. The claims of the holders of the certificates were reported favorably by a master, and, on exceptions to the report, by the purchaser, for himself and other bondholders, the court allowed all the certificates as prior liens, and directed the purchaser to pay their amount into court : *Held,*

(1) The issue of the certificates was proper.
(2) Good faith required that the promise of the court should be redeemed ;
(3) The purchaser and the bondholders were estopped from setting up any claim against the priority of the certificates.

The appeal was dismissed as to the claims of the appellees which did not exceed $5000.

THE court stated the case as follows:

The Toledo, Cincinnati and St. Louis Railroad Company (hereinafter called the St. Louis Company) was organized about June, 1881, and was formed by the consolidation of ten local railroad companies which were engaged in building lines of narrow-gauge railroad in Indiana and Illinois, between Kokomo, Indiana and East St. Louis. A construction company, known as the Western Construction Company (hereinafter called the Construction Company), before that, and in 1880, had entered into contracts with these local railroad companies for the construction of their roads, whereby the Construction Company was to receive for the work all the stock and bonds of the several railroad companies, and, in some cases, in addition, certain local aid which had been raised along the respective lines. The lines had been located and the work was in progress when, in the summer of 1881, it was concluded that it would be better to organize a continuous line of railroad; and with that view the St. Louis Company was formed by consolidation.

There was a local company called the Frankfort and State Line Railroad Company (hereinafter called the Frankfort Company) which had been organized in 1874, to build a line of road from Frankfort, Indiana, westward to the west line of that State. The road was located in part, and a broad-gauge railroad was built from Frankfort west for a distance of about 11 miles, in Indiana. In August, 1880, the Construction Company contracted with the Frankfort Company to build the road of the latter, as a narrow-gauge road, from Frankfort west to the west line of Indiana. The Construction Company was to receive the 11 miles of road, on which there was a mortgage, and $4000 per mile in local aid taxes and subscriptions, which had been voted and raised, and $10,000 per mile in first mortgage bonds, and all the stock of the railroad company, being $2,000,000, except what it should be necessary to deliver to taxpayers for local aid, for which $200,000 was reserved, the length of the line, including the 11 miles, being 67 miles.

In February, 1881, the Construction Company made a contract with Barnes & Co., which was assigned to the Iowa

Construction Company, for the grading of the line and some other work. The line was located early in 1881, by the engineer of the Construction Company, the work was commenced, and the grading had been done to a considerable extent, when, after the formation of the St. Louis Company, the Construction Company entered into a contract with the St. Louis Company to construct a line of narrow-gauge railroad running west from Frankfort, Indiana, to a point on the west line of that State, for which the Construction Company was to receive the bonds and stock of the St. Louis Company.

The Frankfort Company was not included in the consolidation, and the stock of that company was not exchanged for the stock of the St. Louis Company, while the stock of all the consolidated companies was so exchanged. It was not the intention to construct two lines of railroad, but the object was ultimately to consolidate the Frankfort Company with the new organization, and thus form a continuous line. This was not done then, for the reason that it was supposed that if the consolidation should include the Frankfort Company it would render void the local taxes voted, and the local subscriptions made, in aid of that company, which amounted to over $170,000. It was determined, therefore, to keep up the separate organization of the Frankfort Company, although the line of the two roads would be continuous.

The construction of the Frankfort railroad was completed in 1881 or early in 1882, and much of the work was done on the whole line to East St. Louis; but the Construction Company was unable to sell the bonds and stock of the new line, and could not proceed further; and early in 1882, a syndicate was formed in Boston, known as the Delphos Trust, which agreed to take all of the bonds and stock then unsold and pay an amount equal to that estimated as required to complete the road. Under that arrangement, all of the securities then unsold were turned over by the Construction Company to the Delphos Trust, except the stock of the Frankfort Company.

At the time this arrangement was made, the Construction Company was entitled to the whole of the stock of the Frankfort Company, because the Construction Company had com-

pleted its contract with that company, and had at the time $1,000,000 of such stock, and soon after received the remaining $800,000 of it; and it was arranged between the Delphos Trust and the Construction Company that the president of the latter should hold the $1,800,000 of stock until all of the debts of the Construction Company, due to its sub-contractors, were paid. Those debts not being paid, the sub-contractors filed their several claims for liens, and commenced suits to foreclose those liens, prior to March 20, 1883, making the Construction Company and the St. Louis Company parties to the suits.

The road was completed during 1882; but the debts due to the sub-contractors were not paid, and they, having learned of the fact that the stock of the Frankfort Company was held by the president of the Construction Company to secure their claims, being about to commence proceedings to attach such stock, a written agreement was entered into, on the 20th of March, 1883, by the St. Louis Company, the Construction Company, the Frankfort Company, the American Loan and Trust Company of Boston (hereinafter called the Trust Company) and certain of the sub-contractors, namely, Patrick Dowling, H. S. Hopkins & Co., Cochran & Brown, the Iowa Construction Company and Beeson & Hammond, whereby the St. Louis Company gave its notes to said creditors for the amounts of their several claims, payable in instalments, the last to become due running for a year; and, to secure the payment of such notes, the stock of the Frankfort Company, being $1,800,000 in par value, held by the Construction Company, was deposited with the Trust Company, as collateral security, and it was provided that it should be sold in case of default in the payment of the notes, and that on payment of the notes the stock was to pass to the St. Louis Company. In the meantime, the creditors were not to prosecute further their mechanic lien suits. Two creditors, namely, William F. Richie and Henry McPherson, did not sign the agreement or receive any notes.

The reason why the St. Louis Company assumed the debts due to the sub-contractors, was that its officers became fearful

that, by the seizure and sale of the stock of the Frankfort Company, that stock would get into hostile hands, and the St. Louis Company would thus lose 67 miles of its line of road; and they were anxious to stay the mechanic lien foreclosure suits, because they feared that, if those suits were pressed, a receivership of the road might become necessary.

On the 1st of August, 1883, one Braman, a citizen of Massachusetts, filed a bill in equity in the Circuit Court of the United States for the District of Indiana, against the St. Louis Company, as a citizen of Illinois, founded on a judgment obtained by him against that company in a state court of Ohio, asking for the appointment of a receiver of the company, and for the sale of its road to satisfy his debt and the debts of other creditors of the St. Louis Company, on the ground of the insolvency of that company. The bill set forth the contents of various mortgages, which covered in the aggregate the entire property of the St. Louis Company, although there was no mortgage made by it on its line as a whole. These several mortgages were sixteen in number, nine of them being first mortgages and seven second mortgages, the first mortgages amounting to $10,500,000 and the second mortgages to $9,250,000. The Central Trust Company of New York, a corporation of New York, was the sole trustee in all of the mortgages except one, and in that it was a trustee conjointly with Thomas A. Hendricks; and that company and Hendricks were made defendants to the bill.

On the 2d of August, 1883, an order was made by the court, the St. Louis Company and the Central Trust Company appearing by solicitors, the former assenting and the latter not objecting, appointing Edward E. Dwight as receiver, to take possession of and operate the railroad from Toledo, Ohio, through Indiana and Illinois to East St. Louis, and sundry branches in Ohio. Hendricks also appeared and waived process, and stated that he did not object nor consent to the appointment of a receiver.

On the 14th of November, 1883, Dwight, the receiver, filed his petition to enjoin the American Loan and Trust Company from selling the stock of the Frankfort Company. The peti-

tion set forth the agreement of March 20, 1883, and stated that the indebtedness secured by the pledge of the stock was overdue and had not been paid; that the creditors secured by the agreement had demanded of the Trust Company that the stock be sold; that the Trust Company had notified the St. Louis Company that it would, on November 21, 1883, in Boston, sell the $1,800,000 of stock, at public auction, for cash; that it was claimed by the holders of the bonds secured by the mortgage on the railroad extending from Kokomo to East St. Louis, that that mortgage was, at least, an equitable lien on the road of the Frankfort Company; that that claim was disputed by certain of said creditors; that it would be ruinous to the interests of the stockholders and bondholders and creditors of the St. Louis Company, and to the interests of the public, if by the sale of said stock the legal title to that portion of the road between Frankfort and the State of Illinois, and possibly the right of its possession, should be sold away, and the continuity of the line be destroyed; that, in that view, the receiver submitted to the court whether it was not to the advantage of the holders of the mortgage bonds and of all parties in interest that the court should protect the title, continuity and possession of said line of railroad by the issue of receiver's certificates, or otherwise, whereby the indebtedness covered by the agreement of March 20, 1883, might be paid off; and that he was informed and believed that the creditors secured by said agreement were willing to appear voluntarily in the case and to set forth their claims and ask the decision of the court thereon.

The prayer of the petition was, that the court would order said parties so to appear and interplead and set forth their respective claims in the matter of the stock; that the court might thereupon take such action as equity would permit; and that in the meantime it would enjoin the American Loan and Trust Company from the threatened sale of said stock.

By an order made by the court on November 28, 1883, William J. Craig was appointed receiver in the place of Edward E. Dwight, resigned.

On the third of January, 1884, William F. Richie filed an

intervening petition, claiming the benefit of the agreement. of March 20, 1883, on the ground that the Construction Company owed him $12,921.98 for lumber and cross-ties, delivered by him to that company to be used in building the road of the St. Louis Company, and the lines with which it had been consolidated, and praying that he might participate in the fund to be raised from the sale of the $1,800,000 of stock.

On the 28th of January, 1884, the court made an order, on the receiver's petition of November 14, 1883, which set forth that all of the parties named in the receiver's petition, which included H. S. Hopkins & Co., Cochran & Brown, W. F. Richie & Co., Kapp & Co., the Iowa Construction Company, Patrick Dowling and Beeson & Hammond, appeared in open court, in person, or by attorney; that the court found that the facts set forth in the petition were true, and that it would be injurious to the interests of the stockholders, bondholders and creditors of the St. Louis Company, more especially to the bondholders of the portion thereof between Kokomo and East St. Louis, and to the interests of the public, so far as interested therein, that the stock of the Frankfort Company, the legal title to the portion of the road between Frankfort and Illinois, and possibly, the right to the possession of the same, should be sold and the connection and continuity of the line be destroyed; and that it was desirable and necessary for the protection of the rights of all of said parties, and particularly the rights and interests of the holders of the bonds secured by the mortgage on the portion of the line between Kokomo and East St. Louis, that the court should authorize the issue of receiver's certificates in the manner, for the purpose and on the conditions afterwards set forth in said order. It was ordered, therefore, that the receiver issue and deliver to each of said creditors the respective amounts due to them and so secured, to wit: H. S. Hopkins & Co., $30,475.13; Cochran & Brown, $20,061.66; Kapp & Co., $1731.98; the Iowa Construction Company, $33,750; Patrick Dowling, $3375; and Beeson & Hammond, $11,626.14. This did not include William F. Richie or W. F. Richie & Co. or Henry McPherson.

The order directed that the certificates should bear interest

at 6 per cent per annum from April 3, 1883, and should bear date of their issue and be payable on or before one year thereafter ; and it made the indebtedness evidenced by them a first and best lien on all the railroad lying between Kokomo, Indiana and East St. Louis, Illinois.   The order gave the form of the certificates to be issued, which form stated that the certificate was issued in settlement of the indebtedness mentioned in the order of the court, and in a like order made by the Circuit Court of the United States for the Southern District of Illinois, and was a first and best lien on all the line of the railroad company lying between Kokomo and East St. Louis.   The order further directed that the certificates should not be delivered until the parties had all of them cancelled all mechanics' liens claimed by them, and dismissed all pending actions therefor, and surrendered to the receiver the notes of the company held by them, and caused the American Loan and Trust Company to consent in writing to the order and to deliver to the receiver all of the stock so held in pledge.   The order reserved for consideration the claim of W. F. Richie & Co.

On the 4th of March, 1884, the court made an order on the intervening petition of Richie, allowing his claim at $12,921.28, with interest at 6 per cent per annum from July 20, 1882, and directing the receiver to issue and deliver to him receiver's certificates for the amount due him ; and the order contained further provisions like those found in the order of January 28, 1884.

On the 16th of April, 1884, Henry McPherson filed his intervening petition, stating that he was a contractor under a contract with the Construction Company to build in Illinois a portion of the road of the St. Louis Company; that he completed his contract, and, being thus a creditor of the Construction Company, brought suit to enforce his lien, which amounted to $20,000, and received, on January 29, 1883, from the St. Louis Company, notes for that amount, all of that date, the longest running for twelve months.   He claimed a participation in the benefit of the agreement of March 20, 1883, and in the security of the $1,800,000 of stock, and prayed for an order for the issue to him of receiver's certificates to the amount of $20,000.

The petition of McPherson was referred to a master, who, after taking testimony, filed a report thereon on August 29, 1884. The report was in favor of the petitioner, and exceptions were filed to it. The court made an order, on March 26, 1885, which stated the appearance of the Central Trust Company, of the bondholders' committee of the St. Louis Company, of McPherson, and of the receiver, and overruled the exceptions to the report and confirmed it, and directed, " the parties present consenting," that the receiver issue to McPherson receiver's certificates for the amount of his notes, and made provisions in regard to those certificates similar to the provisions contained in the orders of January 28, 1884, and March 4, 1884, in respect to the other certificates.

On the 17th of June, 1884, the Central Trust Company filed a bill in the Circuit Court of the United States for the District of Indiana, against the St. Louis Company, as a corporation of Indiana and Illinois, a corporation of the same name created by the laws of Ohio, Indiana and Illinois, the Frankfort Company, as a corporation of Indiana, Thomas A. Hendricks, as a citizen of Indiana, and Braman, praying for the foreclosure of the mortgages on the line of railroad, including the line of the Frankfort Company. There were various answers to this bill, and on the 12th of November, 1885, a decree was made in the suit brought by the Central Trust Company and in another suit which had been consolidated with it, brought by Edward F. Leonard, which foreclosed a mortgage made July 23, 1881, by the St. Louis Company of Indiana and Illinois, to the Central Trust Company and Hendricks, on its road from Kokomo, Indiana, through Indiana, and Illinois, to East St. Louis, 270 miles long, and securing 3000 bonds of $1000 each. The decree directed the sale of the property, and the assignment to the purchaser of the $1,800,000 of the stock of the Frankfort Company. It appointed two special masters to make the sale, and directed the execution of a deed to the purchaser by them, on compliance with the prescribed terms of sale. It directed the distribution of the proceeds of sale, and provided for the payment of " court and receiver's indebtedness," prior to the payment of anything upon the bonds and

coupons secured by the mortgage foreclosed. It directed that a certified copy of the decree be delivered to the Circuit Court of the United States for the Southern District of Illinois, and contained this clause: "Leave is hereby reserved to said trustees, and to the purchaser or purchasers at the foreclosure sale under this decree, to appeal from any order or final decree made by the court directing the payment of claims as prior and paramount to said mortgage bonds and coupons."

On the 21st of December, 1885, an order was made appointing a special master to report upon claims against the property. On the 30th of December, 1885, the special masters appointed to sell the property filed their report of sale, stating that they had sold it on that day to Sylvester H. Kneeland, for $901,000. On the 5th of February, 1886, an order was made confirming the sale and ordering the delivery of a deed of the property on the performance by the purchaser of the terms of sale specified in the decree. On the 10th of March, 1886, an order was made approving the form of the deed to the purchaser then presented to the court, and directing the deed to be delivered to him. On the 27th of March, 1886, on the petition of Kneeland, the purchaser, an order was made that the clerk of the court assign and deliver to Kneeland the certificate for the $1,800,000 stock of the Frankfort Company.

On the 25th of May, 1886, an order was made directing the special master appointed as to claims to report to the court, among other things: "What receiver's certificates have been issued by said receiver, Craig, to whom such certificates were issued, for what consideration they were issued, when the indebtedness accrued upon which they are based, and whether any of said certificates were issued for a greater or less sum than was proper, and what, if any, of said certificates should be contested, giving dates and amounts of certificates."

On the 4th of April, 1887, such special master filed a report as to the receiver's certificates. He attached to his report an exhibit showing what certificates had been issued, and to whom, and for what consideration, when the indebtedness accrued upon which they were based, and who then held

them. This exhibit covered, among others, the certificates so issued to H. S. Hopkins & Co., Cochran & Brown, W. S. Kapp & Co., the Iowa Construction Company, Patrick Dowling, Beeson & Hammond, William F. Richie and Henry McPherson. The master reported that he had taken testimony offered for the purpose of showing that the court which authorized the certificates had been misled as to the amounts justly due to the parties who applied for them, and of showing that they had been in fact issued for a greater sum than was proper; but that, as the parties had once had a full hearing before the court, he did not feel that the testimony then offered was sufficient to justify opening the decrees as to the amounts allowed, and he therefore found that the certificates were not issued for a greater sum than was proper. He stated that he construed the order of reference as authorizing him to report all facts necessary to enable the court to distribute the proceeds of sale to the persons who had the first lien and claim thereon. He then set forth the proceedings in regard to the issuing of the certificates, as hereinbefore stated, including the contents of the petition of the receiver, and stated that, in the proceedings under that petition, all parties in interest were duly represented and fully heard, the first mortgage bondholders being represented by their trustee as fully and fairly as such trustee was by law authorized to represent them and bind them by its action; and that, after full hearing and consideration, the court made the decree of January 28, 1884. He then set forth the proceedings in regard to the certificates issued to Richie, and stated that all persons, parties to the other proceedings, were made parties to the petition of Richie, and the proceedings on the petition of McPherson, in regard to which he stated that there were appearances by all parties in interest, including the trustee for the first mortgage bondholders. He further stated that no appeal was taken, and no review had of those proceedings, and that the certificates had passed into the hands of their present holders for due consideration, without notice of any proposed contest, and, as was claimed, with the knowledge of the chairman of the bondholders' committee, who was now contesting them. He

further stated that the representative of certain of the first
mortgage bondholders contended that such proceedings were
not binding upon them, and that they ought to be allowed to
contest the certificates and dispute their priority, alleging that
the court did not have before it all the facts relating to the
original transactions; that the additional evidence taken be-
fore him showed that the creditors had no lien prior to the
first mortgage bondholders; that the lien of the latter upon
the 67 miles of road was prior to that of the creditors; that
the claims of the latter were nothing more than the unsecured
construction accounts; that the trust agreement of March 20,
1883, was made without consideration to the St. Louis Com-
pany; that its recitals were false and misleading; that it did
not and could not give to the creditors, who were parties to it,
any lien upon the stock of the Frankfort Company; and that
the court was not justified in enforcing it.   He further stated
that if such allegations were true, the certificates ought to
be contested; and he then proceeded to state the material
facts in reference to each of the eight claims referred to.

Sylvester H. Kneeland, for himself and others, holders of the
first mortgage bonds of the St. Louis division of the St. Louis
Company, filed exceptions to the report of the master.   On
the 16th of September, 1887, the court heard the case and
overruled the exceptions and confirmed the report.   The order
of the court, made on that day, allowed all the receiver's cer-
tificates mentioned in the report and the schedule attached
thereto, as valid and just claims against the St. Louis division
of the road, extending from Kokomo, Indiana, to East St.
Louis, Illinois, and as a lien thereon prior to the first mortgage
and to be paid from the proceeds derived from the sale of that
division, in pursuance of the decree of foreclosure.   It ad-
judged who were the owners and holders of the receiver's cer-
tificates issued to H. S. Hopkins & Co., Cochran & Brown,
the Iowa Construction Company, Patrick Dowling, Beeson &
Hammond, William F. Richie, Henry McPherson, and Kapp
& Co., and named as such owners and holders: C. L. Luce &
Co. and John T. Newton, for $82,891.25; C. L. Luce & Co.,
for $7374.73; the National State Bank of Mount Pleasant,

Iowa, for $36,989.46; the First National Bank of Mount Pleasant, Iowa, for $1286.59; the National State Bank of Terre Haute, Indiana, for $6353.65; W. W. Whitney & Co., for $1696.70; H. E. Bowers, for $1286.59; Emily Worthington, for $2573.18; T. P. M. Roome, for $2573.18; Hugh Dougherty, for $2573.18; William J. Craig, for $1689; John T. Newton, for $13,934.93; and unknown owners for $11,-361.75; the aggregate amount due on all the certificates being $172,681.44, with interest at 6 per cent per annum from September 15, 1887, until paid.

The order further directed that the purchaser of the St. Louis division of the road of the St. Louis Company pay into the registry of the court all of the said sums, with interest; that they be paid over to the owners 'and holders of the certificates; and that the certificates be surrendered to the clerk of the court and cancelled. From this order Kneeland appealed to this court.

*Mr. Robert G. Ingersoll* and *Mr. John M. Butler* for appellant.

These certificates are not negotiable; they are not commercial paper, and the same defences are available that would be available were they held by those to whom they were originally issued. The appellant has the right to contest their validity, as he represents the first mortgage bondholders. *Union Trust Co.* v. *Chicago & Lake Huron Railway,* 7 Fed. Rep. 513; *Turner* v. *Peoria & Springfield Railway,* 95 Illinois, 135; *Stanton* v. *Alabama & Chattanooga Railroad,* 2 Woods, 506; *S. C.* 31 Fed. Rep. 585; *Central National Bank* v. *Hazard,* 30 Fed. Rep. 484. See also Beach on Receivers, sec. 396.

We therefore insist that the certificates were issued under a misconception of the facts; that they were given in payment of construction debts — debts due by the Western Construction Company and not by the railroad company; that the debts for which they were given were not a prior lien to the bonds; that the Frankfort and State Line Railroad Company built no line, issued no bonds, and that its stockholders had no claim

upon the road; that the stock of the Frankfort and State Line Company was of no value, and that the certificates should be set aside and the judgment of the court below reversed.

*Mr. Charles Pratt* and *Mr. W. I. Babb* for appellees.

MR. JUSTICE BLATCHFORD, after stating the case, delivered the opinion of the court.

Excluding the cases which are not within the jurisdiction of this court because the amounts do not exceed $5000, we proceed to examine the merits as to the certificates.

On the part of the appellant, the case has been argued principally on the contention that the sub-contractors had no lien superior to the first mortgage bonds; that the railroad company owed no debt to any sub-contractor; and that the receiver's certificates were issued without consideration, and were invalid as against the first mortgage bondholders. It is urged, that the testimony shows that the certificates were issued under a misapprehension by the court as to the real facts of the case, produced by misstatements and suppressions of facts; that the alleged construction debts and claims, on which they were based, were fictitious, fraudulent and unjust; that the certificates were issued in some cases where nothing was due, and in all cases for a greater amount than was due; that the certificates are not commercial paper or negotiable; that the same defences are available against them that would be were they all now held by the persons to whom they were first issued; and that the appellant, as representing not only himself but the first mortgage bondholders, for whom, and in whose interest, the road was purchased at the foreclosure sale, and to whom the right of appeal was given by the decree of November 12, 1885, has a right, in such representative capacity, to contest the validity of the certificates.

It is contended by the appellant that the Construction Company did not build the road from Frankfort, Indiana, to the west line of Indiana, under its contract with the Frankfort Company, but built it under its contract with the St. Louis

Company. But the contract of the Construction Company to build that line was made with the Frankfort Company on August 31, 1880, more than ten months before the St. Louis Company was formed, which was on the 9th of June, 1881. On the 10th of June, 1881, the Construction Company made a contract with the St. Louis Company to build a line of road for the latter company from Kokomo, Indiana, to East St. Louis, Illinois; and it was expected that when the Construction Company should receive the stock of the Frankfort Company, which it was to receive for constructing the road for that company, there would be a consolidation of the line of the Frankfort Company with the line of the St. Louis Company. The Construction Company in fact built the road for the Frankfort Company; and the latter held the legal title to the road in 1883, whatever equities the St. Louis Company might have had therein. The road was largely built, aside from the iron, before the last-mentioned company was organized. Practically all the right of way was secured by the Frankfort Company and in its name, and the line when built was leased by the St. Louis Company from the other company; and was so held until the receiver was appointed.

Moreover, in the decree of foreclosure of November 12, 1885, under which decree the appellant purchased and holds title, it is said: "Third. The court further finds that so much of said line of railroad, described in the aforesaid mortgages, as lies between the city of Frankfort, Clinton County, Indiana, and the line dividing the States of Indiana and Illinois, being about sixty-seven miles in length, was constructed by a company known as the Western Construction Company under a written contract entered into between it and said Frankfort and State Line Railroad Company on the 31st of August, 1880, except eleven and three-tenths miles that had theretofore been built." The Frankfort Company was a party defendant to the bill of foreclosure filed by the Central Trust Company. It answered that bill and contested the right of the bondholders to a lien upon the sixty-seven miles of road. The decree further finds that the trustees for the bondholders have in equity a lien on the road of the Frankfort Company,

and directs the $1,800,000 of stock of that company to be turned over to the purchaser at the sale.

The court was not deceived as to the true condition of affairs when it ordered the receiver's certificates to be issued, nor were the bondholders or their trustees deceived when they consented to such issue. The petition of the receiver stated all the material facts fully and accurately, and substantially as they were found by the court in its final decree, under which the appellant claims title. It is shown that all of the facts set out in that petition were true, and that the trustees, by their counsel, consented to the issue of the certificates because they were uncertain what view the court might take as to the right of the trustees to a lien upon the line of road of the Frankfort Company, under a mortgage given by the St. Louis Company, which never had the legal title to that line of road. The testimony of Mr. Thomas E. Stillman, the attorney of the Central Trust Company in the foreclosure suit, shows that he consented to the issue of the receiver's certificates covering the road from Kokomo to East St. Louis, and leads to the before-named conclusion; and there is other evidence to the same effect. It does not appear that any one was deceived. The evidence shows that the stock probably would have sold in the market for enough to satisfy the claims made upon it. The master found that the amounts of the claims were correct. The claims, except those of Richie and McPherson, were examined and cut down before the St. Louis Company would give its notes for them; and the amounts of the Richie and McPherson claims were contested in the taking of testimony by the master, before the certificates were issued.

The fifth paragraph of the foreclosure bill filed by the Central Trust Company sets forth the facts connected with the construction of the road of the Frankfort Company, and avers that it was built by the Construction Company under a contract between it and the Frankfort Company, under which the former was to receive all the stock of the latter, except $200,000, and $10,000 per mile in mortgage bonds and all local aid; and that the Construction Company did receive $1,800,000 of the stock, and afterwards held the stock to

secure the amounts due to its sub-contractors. The bill then sets out the trust agreement of March 20, 1883, and avers that, by its terms, when those debts should be paid, the stock was to become the property of the St. Louis Company. It then recites the failure of the last-mentioned company to pay those debts, and avers that the receiver had issued the certificates, under the order of the court, as a paramount lien on the line of the road from Kokomo to East St. Louis, wherewith to pay said debts, and was to hold the stock subject to the order of the court, if it should be redeemed, and then so held it. The bill further claims for the trustee an equitable lien on the sixty-seven miles of the road of the Frankfort Company. The final decree of foreclosure of November 12, 1885, recites the facts substantially as set out in the bill, and states that, with the consent of the Frankfort Company, the road of that company was built with money derived from the sale of the bonds issued by the St. Louis Company; and that, for that reason, and because the receiver's certificates had been issued to the sub-contractors as a first lien on the road from Kokomo to East St. Louis, and the court had come into possession of the $1,800,000 of stock which the sub-contractors had held in pledge as security, the first mortgage bondholders had in equity a lien on the road of the Frankfort Company; and it, therefore, directed that, on the sale of the road, that stock should be turned over to the purchaser of the line.

The creditors were induced by the intervention of the court and the action of the bondholders, acting through the trustees, to release their mechanics' liens and surrender the $1,800,000 of stock held by them as security, and which they were about to sell; and the bondholders procured from the court a decree giving them an equitable lien on that part of the line which was represented by the stock, to make good their title thereto; and the court directed the stock to be transferred to the purchaser. Now the bondholders, who became the purchasers of the road, ask to have the lien of the holders of the receiver's certificates set aside. This demand is entirely devoid of equity.

The interposition of the court in issuing the receiver's cer-

tificates was eminently proper. Where such certificates are issued, and the court, as in this case, impresses upon them a preferential lien, good faith requires that its promise should be redeemed, unless, perhaps, it be shown that the issue of the certificates was actually fraudulent. The propriety of the issue of certificates, in a case like the present, has been sustained repeatedly by this court, by Circuit Courts of the United States and by courts of the States. *Jerome* v. *McCarter*, 94 U. S. 734; *Wallace* v. *Loomis*, 97 U. S. 146; *Miltenberger* v. *Logansport Railway Co.*, 106 U. S. 286; *Burnham* v. *Bowen*, 111 U. S. 776; *Kennedy* v. *St. Paul & Pacific Railroad*, 2 Dillon, 448; *Stanton* v. *Alabama & Chattanooga Railroad*, 2 Woods, 506; *Bank of Montreal* v. *Chicago, Clinton & Western Railroad*, 48 Iowa, 518; *Coe* v. *New Jersey Midland Railway*, 27 N. J. Eq. (12 C. E. Green) 37; *Hoover* v. *Montclair &c. Co.*, 29 N. J. Eq. (2 Stewart) 4; *Meyer* v. *Johnston*, 53 Alabama, 237.

In the present case, the creditors had in their hands, as a pledge for their debts, stock representing 67 miles of road, and that road was a link necessary in the continuous line of road. The bondholders had no legal mortgage thereon, but only an equitable lien. The bondholders, who now object to the priority of the receiver's certificates, were parties to the suit in which the decree was rendered, by their trustees and committee. No appeal was taken from that decree, nor were any steps taken to set it aside. On the contrary, the bondholders purchased the road and reorganized the company, and now hold the road under that decree. The sale of the stock to satisfy the debts of the creditors would have carried with it the title to the road, and put in jeopardy the continuity of the line. It was especially proper for the court to order the certificates to be issued, when the parties in interest consented. The equity of the creditors to whom the certificates were issued, especially as they had the legal title to the $1,800,000 of stock, was as high as the equity of the bondholders, who had no legal mortgage on the road of the Frankfort Company, and whose equitable right to a lien on the 67 miles of that road arose only out of the fact that the road had been built,

in part at least, with money arising from the sale of some of the bonds issued by the St. Louis Company.

The consent of the trustees to the issue of the certificates bound every bondholder. There is nothing to show that the truste s acted corruptly or fraudulently. Under all the circums' .ce of the case, the bondholders are precluded from claiming priority over the receiver's certificates, which were issued for the purpose of preserving the mortgaged property. In *Union Trust Co.* v. *Illinois Midland Railway*, 117 U. S. 434, 461, this court said: "As to receiver's certificates issued, with the sanction of the court, after the trustees become parties, the purchasers and holders should be accorded such rights as, by the settled principles of equity, are accorded to those who deal with judicial tribunals having jurisdiction in the premises." See also *Miltenberger* v. *Logansport Railway*, 106 U. S. 286; Jones on Railroad Securities, sections 539, 540; *Humphreys* v. *Allen*, 101 Illinois, 490, 499.

The appellant and those whom he represents are clearly estopped from setting up any claim against the priority of the receiver's certificates. *Swan* v. *Wright's Executor*, 110 U. S. 590; 2 Pomeroy's Equity Jurisprudence, sections 804, 805.

The certificates are all of them payable to bearer. No one of them is now held by the original parties, but they have all passed into the hands of third persons for a valuable consideration. Those persons had a right to rely on the promise of the court as to their priority, plainly borne on their face, when the consent of the trustees, and thus of the bondholders, was given to their issue.

*The order is affirmed, with costs, as to all the appellees except the First National Bank of Mount Pleasant, Iowa, W. W. Whitney & Co., H. E. Bowers, Emily Worthington, T. P. M. Roome, Hugh Dougherty and William J. Craig, and as to them the appeal is dismissed for want of jurisdiction.*

MR. JUSTICE GRAY was not present at the argument and took no part in the decision.