## VON BOSTON v. UNITED RYS. CO. OF ST. LOUIS et al.

(Circuit Court of Appeals, Eighth Circuit. September 28, 1925. Rehearing Denied January 8, 1926.)

No. 6814.

1. **Street railroads** �köö58—**Trustee of street railway mortgage held not necessary party to bondholder's suit for receiver, whose absence invalidated appointment of receiver.**

Where company, composed of united street railway lines, gave mortgage on all its property as security for bonds issued by subsidiary company, payment of which it had guaranteed, *held*, suit by a holder of such bonds for receiver to conserve property was not a proceeding under the mortgage such that trustee named therein was necessary or proper party, the absence of whom invalidated appointment of receiver.

2. **Receivers** �köö118—**Issuance of receiver's certificates at higher interest rate in payment of mortgage bonds held not breach of covenant in mortgage to pay or extend such bonds when due.**

Where company effecting consolidation of several street railway lines in mortgage securing bond issue covenanted that it would pay or cause to be extended before their maturity dates all existing divisional bonds, that is, bonds previously given by lines before consolidation, and where, after maturity and nonpayment of certain of such divisional bonds, a receiver was appointed in conservation suit by holder of bonds secured by second mortgage, *held*, court, to prevent foreclosure of mortgages securing divisional bonds, and to prevent disintegration of system, properly permitted issuance of receiver's certificates to pay overdue divisional bonds and others subsequently maturing, and though interest rates on certificates so issued were higher than on bonds paid, and increased burden on income secured by first mortgage, nor was issuance of such certificates a breach of covenant to pay or extend such divisional mortgages when due, justifying foreclosure of such first mortgage.

3. **Receivers** �köö117—**Authority to disturb existing liens should be exercised with caution, and no further than necessary.**

Court's authority in receivership proceedings to disturb existing liens should be exercised with great caution, and no further than actually necessary.

4. **Receivers** �köö60—**Administration of trust under bill to conserve assets under circumstances which require borrowing of money should be terminated early.**

Administration of trust under bill to conserve assets of corporation, under circumstances which require borrowing of money, should be terminated at earliest practical moment.

5. **Receivers** �köö174(1)—**Bill to foreclose mortgage of property in hands of receiver held not dismissible, as filed without leave.**

Where holder of bonds secured by first mortgage on street railway company's property, after appointment of receiver in conservation

suit by holder of bonds secured by second mortgage, without leave of court, filed bill in court where receivership was pending, praying foreclosure, and later, with leave of court, filed an amended and substituted bill, *held*, latter bill was not dismissible for failure to obtain leave to file, notwithstanding the leave granted was granted in suit other than that in which receiver was appointed.

Appeal from the District Court of the United States for the Eastern District of Missouri; Charles B. Faris, Judge.

Suit by Milton Von Boston against the United Railways Company of St. Louis and others. Decree of dismissal, and plaintiff appeals. Affirmed.

Ephrim Caplan, of St. Louis, Mo. (Randolph Laughlin, A. M. Frumberg, A. R. Russell, H. W. Blodgett, and W. N. Fisher, all of St. Louis, Mo., on the brief), for appellant.

H. S. Priest and Charles W. Bates, both of St. Louis, Mo., for appellees.

Before SANBORN and KENYON, Circuit Judges, and SCOTT, District Judge.

SCOTT, District Judge. This is an appeal by plaintiff Von Boston from rulings of the District Court sustaining separate motions of the several defendants to dismiss plaintiff's bill. Plaintiff, Von Boston, is the holder of four bonds, of the par value of $4,000, of an issue of $45,000,000, referred to in the record as "Railways 4's," secured by what is referred to as a first general mortgage on the system of street railways in St. Louis. Plaintiff filed his original bill on October 2, 1923, without leave of court, and on November 26, 1923, with leave filed an amended and substituted bill, which is the bill dealt with on this appeal. The plaintiff, Milton Von Boston, is a citizen and resident of the state of Colorado. The defendants are the United Railways Company of St. Louis, a Missouri corporation, herein for brevity referred to as "Railways," Rolla Wells, receiver of said corporation, a citizen and resident of Missouri, and St. Louis Union Trust Company, a Missouri corporation, trustee under said first general mortgage, a citizen and resident of Missouri.

The material facts, concisely stated, are that defendant "Railways" was organized and incorporated about the beginning of the year 1899, for the purpose of acquiring all of the street railways in the city of St. Louis, and consolidating the same into a single general system. During that year "Railways" acquired all of the independent lines of railway in the city of St. Louis, some 13 in number, with the exception of 2, which it acquired a few years later, thus consolidating all of the street railway lines in the city of St. Louis into a single system. At the time of the acquisition of these independent lines, each line carried bonded indebtedness secured by separate mortgage of the original constituent company. On September 20, 1899, following the acquisition and consolidation of these independent lines, "Railways" executed a deed of trust securing an authorized issue of $45,000,000 4 per cent. bonds. This deed of trust was by its provisions to be a first lien on all property owned or thereafter acquired by "Railways," subject only to the pre-existing bonds outstanding against the several constituent lines, in the record and hereinafter referred to as "divisional" bonds. At the time of the execution of this trust deed it was contemplated, and the deed of trust recites, the desire of "Railways" to make provision for purchasing, retiring or exchanging the outstanding bonds of the several constituent lines acquired, and enumerates and describes these several outstanding issues of "divisional" bonds. A large portion of the "divisional" bonds were taken up and retired through the issue of the "Railways 4's," others were acquired and held by "Railways" pending certain events, and certain others are still outstanding. By the terms of the trust deed $14,000,000 in "Railways 4's" were reserved and set aside for the acquisition by purchase or exchange, or for the redemption and payment of "divisional" bonds on the independent lines originally acquired, to be certified and delivered from time to time, when authorized by resolution of "Railways" board of directors, upon conditions in said trust deed named. $3,000,000 of said bonds were reserved and set aside for retirement and acquisition, through payment or exchange, of the bonds of the St. Louis & Suburban Railway Company and of the St. Louis & Meramec River Railroad Company, should the stocks or properties of said companies be acquired. These were the 2 remaining lines not originally acquired, but in contemplation of acquirement at the time of the organization of "Railways" and the issuance of the $45,000,000 of "Railways 4's," and actually acquired about the year 1906.

Following the consolidation of these independent lines, and the issuance of "Railways 4's," "Railways" leased the consolidated lines to St. Louis Transit Company, which operated them for some years. In 1904 "Railways" canceled this lease and undertook the operation of the system, which continued until the appointment of the receiver April 12,

1919. In connection with this transaction St. Louis Transit Company issued $10,000,000 in bonds which were guaranteed by "Railways" and secured by a deed of trust executed by "Railways" on all of its property owned or to be acquired, subject to the several deeds of trust securing existing "divisional" bonds and subject to the deed of trust securing "Railways 4's."

Early in January, 1918, "Railways" was experiencing financial difficulties and embarrassing litigation pended. A stockholder's bill was filed, referred to as the Seaman bill, which sought receivership, marshaling of assets, etc. Issue was joined on this bill, and it was being contested, and the matter was referred to a special master. While this bill was pending, and on April 11, 1919, a creditor's bill was filed by one Adler, holder of certain of the $10,000,000 issue of St. Louis Transit Company bonds. Defendants appeared to this bill, answered, admitting the allegations of the bill, and consented to the appointment of a receiver, and defendant Rolla Wells was appointed receiver on April 12, 1919. At the time of the appointment of the receiver the following bonded indebtedness was outstanding against "Railways":

| Name. | Rate. | Date of Maturity. | Amt. |
| --- | --- | --- | --- |
| Union Depot Railroad Company | 6 % | June 1, 1918. | $2,300,000 |
| St. Louis Railroad Company | 4½% | May 1, 1920. | 1,900,000 |
| St. Louis & Suburban Railway Company (consolidated) | 5 % | Feb. 1, 1921. | 2,000,000 |
| Lindell Railway Company | 4½% | Aug. 1, 1921. | 1,474,000 |
| Cass Avenue & Fair Grounds Railway Company | 4½% | July 1, 1921. | 1,640,000 |
| St. Louis & Suburban Railway Company (general) | 5 % | April 1, 1923. | 4,500,000 |
| Compton Heights, Union Depot & Merchants' Terminal Railroad Company | 5 % | July 1, 1923. | 986,000 |
| St. Louis Transit Company | 5 % | Oct. 1, 1924. | 9,790,000 |
| United Railways Company of St. Louis general mortgage | 4 % | July 1, 1934. | 30,300,000 |

In the "Railways 4's" trust deed, "Railways" covenants that it "will well and truly pay and discharge, or will acquire and deliver to 'trustee' for cancellation, or will extend or cause to be extended, on or before the date of their maturity, all existing bonds of the divisions of railways owned by 'Railways Company' above mentioned, and punctually pay, or cause to be paid, the interest on all such existing obligations, until the same shall either mature or be acquired by 'Railways Company.'" It will be noted that the first item of the foregoing list indicates that $2,-300,000 in bonds of the Union Depot Railroad Company had already matured at the date of the appointment of the receiver and were in default. It will be further noted that said list includes, in addition to seven remnants of issues of "divisional" bonds, $9,-790,000 balance of the $10,000,000 issue of Transit Company bonds, and $30,300,000 "Railways 4's," which had been issued and delivered out of the $45,000,000 for acquisition of lines and payment of "divisional" bonds.

Plaintiff's bill alleges in substance that the "divisional" lines, upon which bonded indebtedness still remained, were of much greater value than their bonded indebtedness, and that they were particularly of great additional value as a part of the consolidated system. The bill particularly alleges, with respect to the St. Louis & Suburban Railway Company line, "that said St. Louis & Suburban Railway Company property and system are and have always been one of the most valuable parts of said United Railways' Company of St. Louis; that, in addition to many miles of private right of way in the county of St. Louis, said St. Louis & Suburban Railway Company owns a private right of way from Vandeventer avenue, in the city of St. Louis, to Hodiamont, on the outskirts of the city of St. Louis, a distance of approximately three miles through the heart of the city; that said Suburban line embraces the only feasible means of creating rapid transit to the western portions of the city of St. Louis and its suburbs, which have grown tremendously in population, and which are urgently in need of rapid transit; that by means of said system either an elevated railroad or open-cut subway can be built between said Vandeventer avenue and said Hodiamont at a comparatively small cost; that the value of said entire system to the United Railways Company has been enormously enhanced since said Suburban mortgages were executed; that because of the territory through which said Suburban line travels, and the length of said line, and the ownership of said private right of way (through the ownership of the capital stock and properties thereof subsequently acquired by the United Railways Company of St. Louis), said line forms one of the main highways of the United Railways system, and so long as it remains an integral part of said system is of great benefit to the entire system, and of value greatly in excess of aforesaid indebtedness thereon; that to be deprived of said line would work a great hard-

ship and loss upon the United Railways system, and to be deprived of said property would work irreparable hardship and loss upon said United Railways Company, and seriously depreciate and jeopardize the value of plaintiff's securities therein; that, as aforesaid, said Suburban properties are worth greatly in excess of said Suburban mortgages, and they are a part of and add to the value of the system and properties constituting the United Railways Company; that, as averred upon information and belief, the holders of the securities of said matured and unpaid Suburban mortgage are desirous. and anxious to acquire possession, control, and ownership of said Suburban properties, and that they are prepared to, and will, bring foreclosure proceedings in order to acquire same;' that, if said Suburban properties be segregated, the value of the railway property will be greatly decreased by many millions of dollars beyond the amount of said Suburban bonds; that such foreclosure would separate the system into two large competing systems; that, by reason of the disproportionate burden of secured liens resting upon the remainder of the railway system, such remainder could not successfully compete against such suburban system if the latter were segregated."

It is therefore apparent, from the allegations of plaintiff's bill, that so far as creditors of all classes, and particularly the holders of "Railways 4's," are concerned, the prevention of disintegration and the maintenance of the integrity of the consolidated system is of the first importance. Such were the conditions that confronted the receiver appointed upon a creditor's conservation bill, at the time of and following his qualification. The earnings of the system being insufficient to pay operating expenses and discharge all interest on bonded indebtedness, the situation was met by the receiver by application to the court for leave to issue and sell receiver's certificates. In plaintiff's bill it is alleged:

"That said Union Depot Railroad Company 6 per cent. bonds were ostensibly paid by said de facto receiver issuing one-year receiver certificates bearing interest at the rate of 6 per cent. per annum, and at a net cost of ten per cent.; that said de facto receiver was unable to pay said certificates, and issued further certificates with which to pay same; that said St. Louis Railroad Company 4½ per cent. bonds were ostensibly paid, and said certificates on said Union Depot Railroad Company 6 per cent. bonds were ostensibly paid by the issuance of further three-year certificates due and payable October 1, 1923, at a rate of interest at 7 per cent. per annum and at a net cost of approximately 9¾ per cent. per annum; that said Lindell Railway Company 4½ per cent. bonds were ostensibly paid by said de facto receiver extending them to October 1, 1923, at a rate of interest of 8 per cent. per annum, at a net cost of approximately 9½ per cent.; that said Cass avenue & Fair Grounds Railway Company 4½ per cent. bonds were ostensibly paid by said de facto receiver extending them to October 1, 1923, at a rate of interest of 6 per cent. per annum, and at a net cost of approximately 7⁷/₁₀ per cent.; that said St. Louis & Suburban Railway Company consolidated 5 per cent. bonds were ostensibly paid or extended by said de facto receiver extending them to October 1, 1923, at a rate of interest of 8 per cent. per annum, and at a net cost of 8 per cent. per annum; that said certificates purport to be, and said bonds not taken up by purported certificates are, a first lien on said respective divisions, which properties are respectively worth many millions of dollars over and above said respective bonds or purported certificates."

It will thus be seen that the receiver effected payment of Union Depot Railroad Company bonds in default at the time of his appointment, and in like manner took care of subsequent maturities, but apparently was unable to do so through the means adopted, except at additional expense and usually by somewhat increased rates of interest. Plaintiff in his bill, as a basis for foreclosure, after charging that the trustee in "Railways 4's" occupies a dual and hostile capacity and attitude and refuses to initiate foreclosure, predicates two classes of defaults and breaches of condition of "Railways 4's" mortgage: (1) That "Railways" breached its covenant to pay or extend the underlying "divisional" mortgages when due; and (2) that mortgagors increased the liens of underlying "divisional" mortgages by paying much higher rates of interest than provided for in the mortgages, and increased the burden upon the income secured by the first general mortgage.

With respect to these alleged defaults, plaintiff's bill develops two theories: (a) That the court was without jurisdiction in the Adler Case (C. C. A.) 266 F. 828, and therefore all actions of the receiver under the order of the court were null and void; and (b) that, conceding jurisdiction in the Adler Case, the court in that case might not lawfully issue receiver's certificates to discharge

such underlying liens, and especially at increased rates or charges, and make them liens upon the respective independent lines with like force and effect as the "divisional" mortgages.

It will therefore be observed that all defaults and breaches of condition of "Railways 4's" mortgage—with the exception of Union Depot bonds maturing June 1, 1918—are attributed to the mortgagor in "Railways 4's" by reason of acts of the receiver and the court, after such mortgagor had been divested of both the means and power to act by the appointment of the receiver. It therefore follows that if the court had jurisdiction in the Adler Case, and if the court had power to make the order for the issuance and use of receiver's certificates upon the conditions named, the payment of the Union Depot Railroad Company bonds by use of such certificates cured the existing default and the payment of subsequent maturities by the same means prevented defaults. The action of the court and receiver stated would deprive the holders of "divisional" bonds and the trustee in "divisional" mortgages of any right or power to reach defaults or breached conditions, and we think at the same time obviate breach of condition of "Railways 4's" mortgage.

[1] As to the first proposition, this court has decided in its opinion in Seaman v. McCulloch et al., 8 F.(2d) 820 decided at this term of court, that the court had jurisdiction in the Adler Case, and that Rolla Wells was a legally appointed receiver, and not a de facto receiver, as indicated by counsel in the present case. Therefore, assuming the legal status of the receiver, we proceed to a consideration of the remaining questions.

[2] Has a court of equity, when it has custody of an extensive street railway system under receivership for the conservation of the property, power to issue receiver's certificates to liquidate a defaulted first mortgage on a part of the system, when failure so to do would be calculated to result in foreclosure, segregation of the particular constituent line, and bring about a general disintegration of the system very destructive of its entire value? And, by the same token, has it power to issue certificates to pay interest on first mortgages of other constituent parts, thus preventing foreclosure and disintegration and destruction of value?

In considering a similar question, the late Mr. Justice Lurton, while on the Circuit Court in the District of Kentucky, in Lloyd v. Chesapeake, O. & S. W. R. Co. (C. C.) 65 F. 351, said:

"I do not think that the duty of preserving the property in charge of the receivers is limited to a mere preservation of the physical structure of the railroad. If the earnings were insufficient to pay off taxes which were a prior lien upon the property, or to pay off mechanics' liens, the enforcement of which would result in a serious disintegration of the road, or to pay off any other claim which was entitled to preference, and which was so situated that for its satisfaction the property might be brought to a premature sale, the court could not only use the earnings in the hands of the receivers, but could charge the property, and every interest in the property, with receivers' certificates, issued for the purpose of avoiding consequences quite as serious in their ultimate effect to subordinate interest as would be the destruction of a bridge. I am convinced that, where large financial interests are secured by a lien of a subordinate character, and a foreclosure of this subordinate lien is sought, subject to prior incumbrances, it is within the scope and discretion of a court of equity, in preserving this subordinate interest, to pay off any just liability of an insolvent railroad company out of the earnings, and, if the earnings are insufficient, that it may authorize the borrowing of money secured by a charge and burden upon the subordinate interests to be thus benefited by the loan. These views I hold very firmly. If they be sound, my duty, under these circumstances, and upon this record, is to see to it that these great subordinate interests are not destroyed as the consequence of an unnecessary precipitancy of the maturity of the first mortgage bonds. Under such circumstances I am convinced that the power of this court to pledge the future surplus earnings of the property and the property interests of the creditors subordinate to the first mortgage is as clear as would be the duty to borrow money to rebuild a bridge, or to prevent the sacrifice of a valuable lease. Miltenberger v. Railroad Co., 106 U. S. 286, 1 S. Ct. 140, 27 L. Ed. 117; Kneeland v. Luce, 141 U. S. 508, 12 S. Ct. 32, 35 L. Ed. 830; Park v. Railroad Co., 64 F. 190. I shall therefore direct the receivers to pay the interest which fell due August 1, 1894, out of the future earnings of the property in their hands, and that they be authorized to borrow a sufficient sum upon receiver's certificates, maturing in not less than three nor more than six months, for the payment of which the future income of the road after paying rentals, necessary repairs, and other operating expenses, will be pledged, and that these certificates shall be

a lien upon the corpus of the property, subordinate, however, to the lien of the first mortgage bondholders, and to every other claim which shall be ultimately held entitled to priority of satisfaction out of the corpus over the first mortgage bonds. The consent of the trustees under the second mortgage that these certificates shall be a charge superior to their own lien operates, in the absence of fraud or corruption, to bind every bondholder of that class"—citing Kneeland v. Luce, 141 U. S. 491, 508, 12 S. Ct. 32, 35 L. Ed. 830.

In American Brake S. & F. Co. v. Pere Marquette R. Co., 205 F. 14, 123 C. C. A. 322, the Circuit Court of Appeals for the Sixth Circuit said:

"Nor is there any doubt of the power of a court of equity, in a proper case, through its receivers (which constitute the hand of the court), to borrow money necessary for conserving the property and continuing its operation, pending foreclosure, reorganization, or other appropriate disposition. A railroad company owes a duty, not only to its creditors and stockholders, but, by virtue of its franchise, to the public as well; and a court which has undertaken the administration of railroad affairs is charged with the duty of conserving and operating the property, so far as can practically be done, for the benefit of both public and private interests. In the exercise of this duty of conservation and operation, it may, in a proper case, make such repairs, replacements, and betterments as are purely essential to such results, and may, in a proper case, make the certificates for such loans a lien even upon the corpus of the property, and, so far as necessary, prior to existing liens. The authority, however, to disturb existing liens, should be exercised with great caution, and should be carried no further than actually necessary to attain the desired result. Wallace v. Loomis, 97 U. S. 146, 152, 162, 24 L. Ed. 895; Miltenberger v. Railroad Co., 106 U. S. 286, 309, 1 S. Ct. 140, 27 L. Ed. 117; Trust Co. v. Illinois Midland R. R. Co., 117 U. S. 434, 6 S. Ct. 809, 29 L. Ed. 963; Atlantic Trust Co. v. Chapman, 208 U. S. 360, 371, 28 S. Ct. 406, 52 L. Ed. 528, 13 Ann. Cas. 1155. While this power has been more often exercised in mortgage foreclosure cases, it is not limited thereto, but may be exercised in creditors' suits such as the one before us. Union Trust Co. v. Illinois Midland R. R. Co., supra, 117 U. S. 458, 6 S. Ct. 809, 29 L. Ed. 963. Disbursements of the nature of those here in question may, in a proper case, constitute expenses of conservation. Wallace v. Loom-

is, supra; Union Trust Co. v. Illinois Midland R. R. Co., supra."

[3] The order in question in this case was made upon notice to the trustee under "Railway 4's" mortgage, and upon full hearing and investigation. We think the court had the power in the circumstances in the exercise of a sound discretion to order the certificates, both for the liquidation of the Union Depot line then defaulted, and to prevent defaults in the subsequent maturities, even though under existing conditions a higher rate was necessitated. We cannot accede to the proposition that in these circumstances the court was bound to let the defaults stand and continue to occur, when they were calculated to result in the disintegration of the great consolidated system of street railways, when the integrity was so vitally essential to the interests of all concerned. We fully recognize the principle announced by Knappen, Circuit Judge, in American Brake S. & F. Co. v. Pere Marquette R. Co., supra, that "the authority, however, to disturb existing liens, should be exercised with great caution, and should be carried no further than actually necessary to attain the desired result."

[4] We also recognize the principle and rule that the administration of such trust under a conservation bill under circumstances which require the borrowing of money, should be terminated at the earliest practicable moment. While we are unwilling to hold that a court of equity, situated as was the trial court in this case, is without power to proceed as the court did proceed, we do not desire to be understood as implying that such measures may be repeatedly and continuously resorted to, to the point where superior liens will be displaced and such lienholders suffer imposition of burdens altogether disproportionate to their share of the general benefit. We cannot altogether overlook the fact that the receivership in this case has continued for a long time. The different classes of parties in interest seem to be unable to co-operate, and a considerable degree of hostility among them is manifest. While the record before us in this case is meager in its disclosures as to the intimate necessities of the receivership, enough appears here, and in the record of cases herein cited which grew out of this receivership, to make it apparent that immediate and material progress in this case must be made looking toward co-operation and rational financial adjustment, if expenditures necessitating the borrowing of money are to be longer justified.

[5] Appellees contend that, without regard

to other matters herein discussed, the bill was properly dismissed because of failure of plaintiff to obtain leave of court to file the bill. The contention is that leave must be had before filing a bill by the court and in the particular case in which the receivership exists. Appellees rely upon the authority of American Loan & Trust Co. v. Central Vermont R. Co. (C. C.) 84 F. 917, and American Loan & Trust Co. v. Central Vermont R. Co. (C. C.) 86 F. 390. The rule contended for seems to have been upheld by the District Court for the District of Vermont in these two cases. In considering a similar question the Supreme Court of the United States in Jerome v. McCarter, 94 U. S. 734, 24 L. Ed. 136, said:

"A further objection insisted upon is that, while the property was in the charge of a receiver appointed in the suit brought by Sutherland to foreclose the first mortgage, and therefore, as it is said, was in custodia legis, this bill was filed without leave of the court. If there could, under any circumstances, be any force in this objection, there is none now. Both suits were brought in the same court; these appellants appeared, answered, and cross-examined witnesses, and made no allegation that the suit had been brought without leave until about a year and a half afterwards. It was then too late. They must be held to have acquiesced, and, if not, leave of the court to commence and prosecute the suit must be presumed after the orders made to facilitate its progress."

In the instant case plaintiff did not obtain leave to file the original bill, and motions to dismiss were filed urging among others that particular point. Later counsel for plaintiff appeared in court and orally applied for leave to file an amended and supplemental bill in that case. An order was entered, granting leave to file such bill and permitting the refiling of the original motions to dismiss to the amended and supplemental bill, and they were refiled without change. At a later date an order was entered permitting an amendment to the amended and supplemental bill, and at a still later date the motions to dismiss were submitted. The motions to dismiss were not uniform in substance. Neither the motion of the defendant "Railways" nor the motion of St. Louis Union Trust Company, trustee, raised any question of leave to file. The motion of the receiver did raise that question. On the submission the court sustained each of the three motions. There being nothing in the record to indicate that the trial court was not fully advised when leave to file the amended and

supplemental bill was granted, we think that it may be assumed that the trial court sustained the motions to dismiss upon the ground urged in all of the motions, that the facts stated in the bill did not constitute a cause of action or entitle plaintiff to any relief. Both this and the Adler suit were in the same court. The same counsel were familiar with and appeared in matters connected with both cases. We cannot think that, when the court granted leave to file the amended and supplemental bill in the instant case, the order was futile merely because the court, in recording the order, placed at the head of the record the title of the Von Boston Case, instead of the title of the Adler Case. It is undoubtedly better practice to make the application in the case in which the receiver is appointed; but where the application is to the same court, and for a filing in the same court, we cannot say that it is absolutely jurisdictional that it be entitled in the same cause.

Having reached the conclusion that there was jurisdiction in the Adler Case, and that the trial court was justified in the circumstances in the issuance of receiver's certificates for the purposes questioned, and that its action in so doing cannot be attributed to the mortgagor as a breach of condition, we therefore are of opinion that the decree of the trial court dismissing plaintiff's amended and supplemental bill should be affirmed.