CENTRAL TRUST CO. OF NEW YORK et al. *v.* MARIETTA & N. G. R. CO. et al.

BOSTON SAFE-DEPOSIT & TRUST CO. v. HOLDERS OF $130,500 OF RECEIVER'S CERTIFICATES.

(Circuit Court of Appeals, Fifth Circuit. May 12, 1896.)

No. 461.

EQUITY PRACTICE—PARTIES BOUND BY ORDER—RECEIVER'S CERTIFICATES.
    The M. Railroad Co., owning a line of railroad in Georgia, made two mortgages of the same to the B. Trust Co. to secure issues of bonds. Subsequently it was consolidated with another railroad company, owning a line in North Carolina, to form the M. Railway Co., which made a mortgage on the whole line to the C. Trust Co. to secure another issue of bonds, which were used in part to extend the road into Tennessee. The railroad company defaulted on all the bonds, and the C. Trust Co. commenced a suit to foreclose its mortgage, in which a receiver of the road was appointed. Upon petition of such receiver an order was made, authorizing him to issue receiver's certificates to pay for building a bridge over the Tennessee river, such certificates to be a first lien on the whole railroad in the three states. At the time of the commencement of this suit and the making of this order, the C. Trust Co. held a large proportion of the first and second mortgage bonds on the Georgia road. After the making of the order, but before the actual issue of the certificates, the B. Trust Co. commenced a suit to foreclose the mortgages on the Georgia road, made to it, and prayed for and obtained the extension of the receivership to its suit; the order entered on its motion directing that the receiver should conform to all the requirements and orders previously imposed on him in the C. Trust Co.'s suit. The certificates were afterwards issued, in payment for building the bridge. The two foreclosure suits were consolidated. On May 13, 1893, a decree was made foreclosing all the mortgages, directing a sale, appointing a special master to report as to the priority of

the receiver's certificates over the mortgages to the B. Trust Co., and expressly reserving the question of such priority for future adjudication. The master reported that the certificates were not entitled to such priority, but, no sale having been made under the decree of May 13, 1893, another decree was made, on June 8, 1895, adjudging that the certificates were entitled to such priority, from which decree the B. Trust Co. appealed. Another decree was made on October 10, 1895, modifying the terms of sale, but confirming the adjudication as to priority of the certificates and mortgages, and from this decree no appeal was taken. *Held*, upon the appeal from the decree of June 8, 1895, that while the fact that the decree of October 10th had become conclusive by the expiration of the time to appeal, rendered this appeal useless, upon the merits, the decree of May 13th could not be deemed final, in relation to the question of priority, since it expressly reserved that question; and, as the B. Trust Co. had been charged with notice of the terms of the order directing the issue of the certificates, and had failed, at the time or at the commencement of its suit and the extension of the receivership, to object to the provision making them a first lien on the whole line, but had permitted the receiver to go on and issue them, it, as well as the court, was bound by the terms of the order, and good faith required a decree such as was made. Speer, District Judge, dissenting.

Appeal from the Circuit Court of the United States for the Northern District of Georgia.

The Marietta & North Georgia Railway Company, herein styled the "Railway Company," is a consolidated corporation, composed of the Marietta & North Georgia Railroad Company, herein styled the "Railroad Company," and the Georgia & North Carolina Railroad Company. At the time of the consolidation there were outstanding on the Marietta & North Georgia Railroad bonds issued by the Railroad Company aggregating $1,206,000. Said' bonds are secured by two mortgages, dated July 1, 1881, executed by the Railroad Company to the Boston Safe-Deposit & Trust Company, covering the railroad in Georgia. At that time all of said railroad was narrow gauge. It was narrow gauge at the time of the consolidation, and when, January 1, 1887, the Railway Company executed to the Central Trust Company of New York its consolidated mortgage under which $3,821,000 bonds were issued. Of these bonds 817, of $1,000 each, were exchanged for 817 of Railroad Company's bonds of 1881, of $1,000 each. The balance issued for other valuable consideration, and all are now outstanding. The mortgage covered all of the railway of the mortgagor, built and to be built, extending from Marietta, Ga., to Knoxville, Tenn., via Blue Ridge, Ga., and from Blue Ridge, Ga., to Murphy, N. C. The purposes of this mortgage were, among others, to pay off the first and second mortgage bonds, to complete the railway through Tennessee into Knoxville, and convert the narrow-gauge tracks covered by the first and second mortgages into standard-gauge tracks. The bonds were expended for the purposes alleged. The track from Blue Ridge to Marietta was broadened to standard gauge, and its bridges and trestles strengthened, and new rails laid on parts, and the road was extended from Blue Ridge nearly to Knoxville, Tenn.

On January 12, 1891, the Central Trust Company of New York filed its bill in the United States circuit court for the Northern district of Georgia against the Railway Company to foreclose the consolidated mortgage; the bonds secured by it, as well as the first and second mortgage bonds, being in default. On the 19th of January, 1891, J. B. Glover was appointed temporary receiver of all the railway and assets of the said defendant, and on the 10th of February, 1891, was confirmed as permanent receiver, with the usual authority to operate the railway. The Railway Company at the time was insolvent, and the railway property was in an incomplete and poor condition. On March 25, 1891, the receiver filed his petition, in which he made a detailed report as to the condition and necessities of the property. Item 5 of this petition showed the want of terminals at and access to Knoxville as follows:

"The Marietta & North Georgia Railway have no terminal facilities whatever secured at Knoxville, Tennessee, but their trains are carried over a mile

of the track of the Knoxville & Augusta Railroad, and across the Tennessee river on the bridge of the said last-named railway company. * * * That by building into Knoxville the said railway will then be relieved from going over the track of the said Knoxville & Augusta Railroad for over a mile, and crossing the Tennessee river on the bridge of the said last-named railroad, at a cost of about two dollars a loaded car; and that in Knoxville a close connection will be made with the Knoxville & Cumberland Gap Railway, which runs for a distance of 74 miles, to Middlesboro, in Kentucky, and there connects with the L. & N. System."

The petition was referred to the special master, who made a report thereon, finding, as matter of fact, that the building of the bridge was necessary to enable the road to earn operating expenses: that it had recently been cut off by the Knoxville & Augusta road from entering Knoxville over its bridge, which it formerly used; that the rent it had paid before it was so cut off was 12 per cent. upon the estimated cost of the bridge; and that the want of facilities curtailed its revenues $3,000 per month. On December 9, 1891, the receiver's petition was granted, and certificates ordered issued, to be a first lien on the whole railway property, to wit: They were "declared to be a first lien on the whole of the Marietta & North Georgia Railway property, extending from Marietta in the state of Georgia, a distance of about 83 miles, and thence on and into the state of Tennessee to a point at or near the city of Knoxville, in Knox county, a further distance of about 122 miles, and also for the narrow gauge part of the road from Blue Ridge, Georgia, to Murphy, in Cherokee county, North Carolina, a distance of about 25 miles,—the whole line of railway aggregating about 231 miles, together with all the railway tracks, appliances, appurtenances, and other property thereupon situated or belonging; and also upon the extension of said road, the bridge to be built over the Tennessee river at Knoxville, and the terminal facilities to be acquired in the city of Knoxville, and all other property, rights, and appurtenances to the said Marietta & North Georgia System now belonging or appertaining, or hereafter to be acquired." This order was, on December 14, 1891, confirmed in Tennessee, in the bill there pending. On January 18, 1892, the bridge contract was let to Grant Wilkins, his bid being considered the best. None of these certificates were issued on the above orders before April 15, 1892.

On the 30th of March, 1892, and before any of said receiver's certificates had been issued, the appellant the Boston Safe-Deposit & Trust Company filed its bill in the United States circuit court for the Northern district of Georgia to foreclose its said first and second mortgages. This bill recited that the railroad was already in the hands of Glover, receiver under the foreclosure proceedings before mentioned, referring to said cause, and asking "that it may be allowed to refer to and use all the pleadings, papers, and other documents connected with said suit of said Central Trust Company of New York as fully and as freely as if the same formed a part of this suit now brought by your orator." It also showed that it was necessary, for the protection of the first and second mortgage bondholders, "that the receivership already had upon said property in the aforesaid suit of Central Trust Company of New York should be continued, and that the same receiver now in charge of said property should be made the receiver under said first and second mortgages now sought to be foreclosed by your orator." It further stated "that the said property covered by said mortgage being foreclosed by Central Trust Company of New York constitutes and forms one railway system, extending from Marietta, Georgia, to Knoxville, Tennessee, and from Blue Ridge, Georgia, to Murphy, North Carolina; * * * that the said mortgaged premises are so situated that the same cannot be sold in separate parcels without creating irreparable loss and sacrifice."

On April 6, 1892, an order was taken, on motion of appellant's solicitors, appointing Glover receiver under said last-named bill, said order containing the following clause: "It is further ordered that the receiver comply with and conform to, in the management of said property, all the requirements and orders hereinbefore imposed upon him under the orders appointing him receiver in the case of Central Trust Company of New York v. Marietta & North Georgia Railway Company." On the 20th of January, 1893, the Central Trust Company of New York filed an amendment and supplement to

its original bill, in which it was alleged that, under the conditions of the mortgage and the election of the trustee, the entire amount of principal of the mortgage of 1887 had become due, and, further, that the Central Trust Company of New York, as trustee, held 777 bonds, of $1,000, of the Railroad Company, secured by the mortgage and deed of trust in favor of the Boston Safe-Deposit & Trust Company as collateral security.

On March 13, 1893, an order was entered by consent of counsel consolidating the two causes into one cause under the name of "The Central Trust Company of New York and Boston Safe-Deposit & Trust Company, Complainants, v. The Marietta & North Georgia Railway Company and Marietta & North Georgia Railroad Company et als., Defendants,"—all proceedings thereafter to be had in said consolidated causes. On May 13, 1893, the consolidated cause came on for hearing, and a decree was rendered foreclosing the mortgages in favor of both the trustees and directing a sale of the mortgaged property. Among other things ordered and decreed were the following:

"The purchaser shall not be required to pay immediately in cash the amount of any receiver's certificates, notes, debts, or obligations which shall not have become due and payable at the time of the completion of the purchase, but shall receive the deed and take the property purchased subject to the condition that such amounts shall be paid in from time to time as such obligations shall mature, and which amount shall thereupon be credited upon the amount of the bid; the court reserving the right to resell the premises, or any part thereof, in case of any failure or omission of the purchaser to pay such amount into court on account of the bid as aforesaid. * * * The purchaser or purchasers at said sale shall, as part of the consideration of the purchase price, take the property purchased upon the express condition that, should the amount bid be insufficient therefor, he or they will, notwithstanding, pay off and satisfy any and all outstanding and unpaid receiver's certificates or receiver's notes or obligations given for equipment, and all other claims now pending and undetermined in this court, or in the circuit court of the United States for the Eastern district of Tennessee, or in the circuit court of the United States for the Western district of North Carolina, or in the circuit court of appeals for the Sixth circuit, or which shall be presented in such courts, or either of them, within sixty days after the first publication of a notice to present such claims for allowance, if and when said courts or either of them shall allow such claims, and adjudge the same to be prior in right to the mortgages foreclosed in this suit, or either of them, and in accordance with the order or orders of the court allowing such claim, and adjudging with respect thereto. * * * The fund arising from the sale of the property covered by and embraced in said first and second mortgages shall be applied as follows, to wit: First. To the payment of the costs of said suit," etc. "Second. To the payment of the proportion of all outstanding and unpaid receiver's certificates and receiver's notes then due, issued under orders of this court, as well as other just debts and obligations of the receivership, including the debt due from the receiver to the Central National Bank of New York for money borrowed on a pledge of receiver's certificates, as the special master shall find to be due upon and from that part of the Marietta & North Georgia Railway and its proportionate part of the equipment covered by and embraced in said first and second mortgages to said Boston Safe-Deposit & Trust Company, and which may be found and determined to be prior in right to the lien of the bonds secured by said first and second mortgages,—said debt so due to said Central National Bank being fifty-two thousand dollars, besides interest, and it being the intention and decree of the court that the whole of said debt so due to said bank shall be paid out of the cash fund or funds to be paid over to the commissioner at the time of making the sale, and the receiver's certificates so pledged to secure said debt shall then be taken up and canceled by said commissioner appointed to make such sale or sales. Nothing herein contained shall be held or taken to adjudge that said receiver's certificates, other than those certificates pledged with the Central National Bank, are entitled to any priority over said first and second mortgage bonds, that question being reserved for future adjudication. * * * And it is further ordered that Benj. H. Hill, Esq., special master in this cause, do

take proofs and report to this court with all convenient speed: (1) What claims, if any, are outstanding, that are prior in equity to either or any of the bonds secured by the several mortgages aforesaid. To classify such claims and report on what property, if any, the same shall be charged. * * * (4) And to take and state an account showing the number and amount of receiver's certificates, not including those certificates pledged to the Central National Bank of New York, and the number and amount of receiver's notes for equipment, which are outstanding and unpaid, and the amount of other just debts and obligations of the receivership. And that such special master also state what proportion of such outstanding certificates, notes, and debts are a proper charge and lien upon that part of the line of the Marietta & North Georgia Railway lying in the states of Tennessee and North Carolina, and also what proportion of said certificates, notes, and debts are a proper charge and lien upon the part of the line of the Marietta & North Georgia Railway lying in the state of Georgia. That such finding of said special master be certified to this court, so that the special commissioners making the sale may give notice to the purchaser or purchasers what amount of said certificates, receiver's notes, and debts are a charge upon each of said lines of railway, and to be assumed and paid by the purchaser or purchasers as prior in right to the bonds: provided, however, that the receiver's certificates issued or to be issued for the construction of the bridge and approaches over the Tennessee river at Knoxville, Tennessee, and aggregating not more than $130,000 principal, are to be a charge solely on the line of railway in the state of Tennessee. The said special master and examiner shall make and certify such reports to this court at least ten days before the day which shall be appointed for the sale under this decree. All questions not hereby disposed of and determined, including the discharge of the receiver and the passing of his accounts, are hereby reserved for future adjudication, the settlement of the same being held not necessary for the purposes of this decree. And the court reserves the right to make such further order at the foot of this decree as may be just and proper."

On the 17th of February, 1894, the special master reported, among other things, as follows:

"Under an order of the court authorizing him to do so, the receiver has issued one hundred and thirty thousand five hundred ($130,500.00) dollars of certificates. A list of such certificates is here shown, giving the number and amount, and to whom issued. It will be seen that the certificates were issued for the purpose of building the bridge over the Tennessee at Knoxville, and for approaches to said bridge. These certificates constitute a lien on the property of the Railway Company, and are superior in rank to the lien of the first and second mortgages, or the mortgage of January 1, 1887. They are of equal rank among themselves and with the other debts and expenses of the receiver. Under the decree of foreclosure, the entire amount of receiver's certificates is to be a charge solely on the line of railway in the state of Tennessee. * * * For the purpose of convenient reference, the master submits a summary of his findings, stating the aggregate amount under each head: * * * (2) Receiver's certificates outstanding and unpaid, $130,500.00; (3) receiver's notes for rolling stock and equipment, $174,084.88. * * * The whole amount above itemized the master finds, and so reports, is a lien against the railway and the property in the hands of the receiver, superior in rank to the liens of the first and second mortgages of the Boston Safe-Deposit & Trust Company and to the consolidated mortgage of January 1, 1887, to the Central Trust Company of New York, and, except as to amount due for taxes, are of equal rank among themselves. The court directs that the master should find what proportion of such outstanding certificates, notes, and debts are a proper charge and lien upon that part of the line of the Marietta & North Georgia Railway lying in the states of Tennessee and North Carolina, and also what proportion of said certificates, notes, and debts are a proper charge and lien upon that part of the line of the Marietta & North Georgia Railway lying in the state of Georgia. The master has covered this part of the reference in the various items above stated, but for clearness of understanding the master will again state his findings on this point: (1) The entire issue of $130,500 of receiver's certifi-

cates are a charge and lien upon that part°of the line of the Marietta & North Georgia Railway lying in the state of Tennessee, as per the order of the court in its decree of foreclosure and sale."

To this report the Boston Safe-Deposit & Trust Company filed no exception before the special master, but did file exceptions in the court to many items contained in the special master's report. None of these exceptions, however, relate to the lien of the receiver's certificates issued to build the Tennessee bridge.

It appears that, under the decree of May 13, 1893, no sale was effected, so that thereafter, and for that reason, on June 4, 1895, upon the application of complainants' solicitors, a supplemental decree of sale was entered. This supplemental decree distinctly modified the original in many important respects, and contained, among other things, the following provisions:

"And the receiver's certificates issued under the order of this court for the purpose of building the bridge over the Tennessee river at Knoxville, and for acquiring of the right of way thereto, and the approaches to same, are hereby declared a lien prior in right to the bonds secured by the mortgage given to the Central Trust Company of New York on all of the said Marietta & North Georgia Railway in the states of Tennessee, Georgia, and North Carolina; and the question of the priority of the lien of the said receiver's certificates over the bonds issued under the mortgage given to the Boston Safe-Deposit & Trust Company is reserved for further adjudication on Saturday, the 8th of June, 1895, before this court, or so soon thereafter as counsel can be heard. Also, the question of the priority of the equipment and rolling stock notes is reserved to be passed upon at the time above stated. * * * The purchaser or purchasers at the sale or sales may pay, in lien claims at par, whether such lien claims be amounts adjudged to George R. Eager as principal contractor for the Knoxville Southern Railroad, receiver's certificates of the issue of $130,500, bonds and past-due coupons of the consolidated mortgage made to the Central Trust Company of New York, or bonds and past-due coupons of the two mortgages made to Boston Safe-Deposit & Trust Company, instead of cash, such proportion of the purchase price or prices as may under the terms of the decrees in this cause and in the said cause pending at Knoxville be coming to or payable upon such lien claims out of the fund or respective funds arising from the sale or sales."

Afterwards, on the 8th of June, 1895, a decree was entered fixing the lien of the receiver's certificates issued for the construction of the Tennessee bridge as follows:

"That the construction of the bridge, with its approaches, over the Tennessee river at Knoxville, as ordered and directed by this court, was necessary for the preservation and management of the railroad property sought to be sold in this cause; that the receiver's certificates, amounting in principal to the sum of $130,500, issued and used by the receiver under the orders of this court in the construction of said bridge at Knoxville, Tennessee, and in constructing the approaches thereto, and acquiring the rights of way for said approaches and bridge, were properly issued, and now constitute a first lien upon the entire line of the Marietta & North Georgia Railway in the states of Georgia and North Carolina, and in Tennessee subject to the priorities decreed by the United States circuit court at Knoxville, Tennessee, and all other property, rights, and appurtenances to the said Marietta & North Georgia System belonging to or appertaining, or hereafter to be acquired, as provided in the order of this court authorizing the receiver to issue receiver's certificates for the purpose of building a bridge across the Tennessee river at Knoxville, entered December 9, 1891, and are entitled to priority over the first and second mortgage bonds secured by the mortgages or deeds of trust executed by the Marietta & North Georgia Railroad Company to the Boston Safe-Deposit & Trust Company, and dated July 1, 1881, and known as the first and second mortgages, and fully described in the pleadings in these causes. And that said receiver's certificates, with interest, or so much thereof as is not paid out of the proceeds arising from the sale of said bridge and approaches, situated at Knoxville, Tennessee, and the line of railroad in Tennessee, shall be paid out of the proceeds arising from the sales of the several parts of the Marietta & North Georgia Railway lying in the states of

Georgia and North Carolina, and the rolling stock sold in connection therewith, upon the same footing as receiver's notes and other receiver's expenses, as provided in the second clause on the twenty-eighth page of the original decree of foreclosure now on file in this cause, and which was entered in this cause on the 13th day of May, 1893. And this decree is hereby made a supplemental decree to the decree entered in this cause on June 4, 1895."

On the rendition of this decree the complainants in open court gave notice of appeal. Finally, on the 10th of October, 1895, the consolidated cause came on for hearing, and upon motion of the solicitors for the parties in interest, and it appearing to the court that the sale advertised to be made under the former decrees rendered in the cause was not made for want of a bidder, it was then ordered, on motion of the parties, that the said railroad property be again offered for sale to satisfy the liens, claims, and debts heretofore adjudged in the cause, but making certain changes and modifications to the former decrees respectively. The court then proceeded to reduce the upset price which had been before fixed by former decrees, among other things provided that all parties to the cause should look alone to the funds arising from the sale for the payment of their respective claims, and that the purchaser upon the payment of the purchase price should take and hold the property free from all liens, claims and liabilities. It was further decreed that the purchaser of the property in its entirety should deposit the sum of $92,500 at the time of his bid, and that within 30 days after confirmation he should pay in cash to the commissioners one-half of the balance of the purchase price, with interest thereon at the rate of 6 per centum per annum from the date of sale, and that each and all of the receiver's notes and certificates, including the bridge certificates, shall be received as cash at their face value. It was further decreed that the third and last payment should be made in six months from the date of confirmation, to draw interest at the rate of 6 per cent. from the date of confirmation, and that receiver's certificates and notes and the contractor's liens, together with all other liabilities of the receiver, shall be received as cash according to their respective interests for such payment. The said decree contained several other provisions distinctly recognizing the priority of the lien of the bridge certificates over the first and second mortgage bonds.

On December 2, 1895, the Boston Safe-Deposit & Trust Company prayed for an appeal from the decree rendered on the 8th of June, 1895, which was granted, bond accepted, and the following errors assigned:

"(1) That the court erred in holding and decreeing, in its said decree filed on the 8th day of June, 1895, that the exceptions to the report of said special master should be overruled, wherein said special master had found that the said receiver's certificates, given by said J. B. Glover, as receiver, to the extent of $130,500, were a prior lien to the lien of the first mortgage bonds secured by deed of trust being foreclosed by petitioner, Boston Safe-Deposit & Trust Company. (2) That the court erred in holding and decreeing, in its said decree of 8th of June, 1895, that all exceptions to said report of said special master, in so far as they refer to and attack the superiority of the lien of said receiver's certificates for $130,500, should be overruled. (3) That the court erred in holding and decreeing, in its said decree of 8th of June, 1895, that the said receiver's certificates of said receiver, J. B. Glover, issued and outstanding to the extent of $130,500, were prior in right and superior in lien to the first mortgage bonds secured by deed of trust given to Boston Safe-Deposit & Trust Company by the Marietta & North Georgia Railroad Company on the 1st of July, 1881. (4) That the court erred in not holding and decreeing that the exceptions to the report of the special master should be sustained, wherein exceptions were taken to the finding of said special master in favor of said receiver's certificates issued by said receiver as being subordinate and inferior to the lien of the deed of trust given to the Boston Safe-Deposit & Trust Company securing the first mortgage bonds upon said Marietta & North Georgia Railroad. (5) That the court erred in not holding and decreeing that the lien of the said first mortgage bonds upon said Marietta & North Georgia Railroad was superior and prior to the lien of the said receiver's certificates so issued and outstanding to the extent of $130,500, said certificates having been authorized and issued in the suit of Central Trust Company of New York against Marietta & North Georgia Railway Company at a time when the Boston Safe-Deposit

& Trust Company was not a party to said clause, and before it filed its bill in the circuit court of the United States for the Northern district of Georgia, or elsewhere, foreclosing its first mortgage upon said Marietta & North Georgia Railroad. (6) That the court erred in not holding and decreeing that the exceptions to the report of the special master were in all respects well founded, in so far as they touched upon the question of the priority of lien of the bonds secured by said first mortgage given to the Boston Safe-Deposit & Trust Company by the Marietta & North Georgia Railroad Company, as opposed to the priority of lien of the said $130,500 of receiver's certificates."

Henry B. Tompkins and J. R. Lamar, for appellant.

James H. Gilbert, J. D. Rouse, and Wm. Grant, for appellees.

Before PARDEE and McCORMICK, Circuit Judges, and SPEER, District Judge.

PARDEE, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

This appeal is from the supplemental decree of June 8, 1895, although taken and perfected after the decree of October 13, 1895, which last-mentioned decree is not complained of, although it fully recognizes and determines the priority of the lien for the bridge certificates over the lien of the bonds represented by the Boston Safe-Deposit & Trust Company. Moreover, the said decree of October 13, 1895, is now final and conclusive on all the parties thereto, and beyond the power of this court to review, because not appealed from, and more than six months have elapsed since its rendition. It is dehors the record, but admitted by counsel, that a sale has been made under the said decree of the property of the railway as an entirety. In this state of the case it would seem to be of little use to review the rulings of the circuit court in the supplemental decree of June 8th in relation to the priority of lien of the bridge certificates over the first and second mortgage bonds, particularly as the reversal of said decree will avail nothing to the appellant, since, under the terms of the decree of October 13, 1895, the purchaser is allowed to turn in the bridge certificates as cash in payment of the price; and, if not so turned in, the said certificates are to be paid and extinguished out of proceeds of the sale before the bonds represented by the appellant can be paid.

The appellant contends that the decree of May 13, 1893, was a final decree, and that, by the provisions in the order of reference, it was adjudicated finally and conclusively between the parties that the bridge certificates were to be a charge solely on the line of railway in the state of Tennessee. We do not agree that, in relation to the payment and priority of the bridge certificates, the decree of May 13, 1893, was a final decree. To give it such effect would be to go contrary to the general terms and purport of the decree, and particularly, to the express declaration, therein contained, that such question was reserved for future adjudication. That the decree was not intended to be final in respect to the bridge certificates appears from the fact that the judge who rendered it thereafter took up, considered, and adjudged the matter, as fully shown in the foregoing statement.

If the decree of May 13, 1893, did not finally and conclusively

establish the equities between the holders of the bridge certificates and the holders of the first mortgage bonds, the question arises whether the decree of June 8, 1895, is open to the complaints set forth in the assignments of error. The substance of the assignments is that the court erred in giving priority to the certificates over the lien of the first and second mortgage bondholders on that part of the railway property situated in Georgia, to which part of the railway property the mortgage to secure the first and second bonds was limited. The record shows that, at the filing of the suit by the Central Trust Company of New York and the appointment of a receiver, the Railroad Company and the Railway Company were in default in the payment of interest upon the first and second mortgage bonds and generally insolvent. It further shows that 297 out of 680 of the first mortgage bonds and 480 out of 486 of the second mortgage bonds were at that time, and during the proceedings in the case, actually held and represented by the Central Trust Company of New York, the complainant in the suit charged with actual notice, if not invoking, the action of the court in respect to the very issue of certificates in question; and, further, that 28 other bonds were represented by the committee of bondholders who from the beginning of the litigation took an active part and interest therein. From these facts it appears that the holders of the first and second mortgage bonds were charged with full notice that the court was in possession of the property and dealing with the same as a whole. The order of court authorizing the issuance of the certificates in question declared that, when issued, they should be and become a first lien on the whole of the Marietta & North Georgia Railway property, extending from Marietta, in the state of Georgia, to Knoxville, in the state of Tennessee, and all other property, rights, and appurtenances to the Marietta & North Georgia System then belonging or thereafter to be acquired. The issue was intended for and resulted in an improvement of the whole property. When the Boston Safe-Deposit & Trust Company filed its bill, it impliedly, if not expressly, ratified all the orders of court previously made as to the administration of the property. At that time, while the order authorizing the issuance of certificates for the building of the bridge had been passed, and the contract for the building of the bridge had been authorized by the court, yet the certificates had not been issued, nor were they issued until after the Boston Safe-Deposit & Trust Company had made itself a party to the receivership. If the said trust company objected, or proposed to object, to the improvement of the whole system under the terms of the previous orders of the court, the duty devolved upon it to make seasonable objection to the proposed work and to the promised lien on the entire system. Instead of objecting, the trust company obtained an order directing the receiver to carry out and comply with all orders and requirements imposed on him in the case of the Central Trust Company v. Marietta & North Georgia Railway Company. As the Boston Safe-Deposit & Trust Company was charged with notice of the litigation prior to the filing of its bill for foreclosure, and did not make seasonable objection after filing the said

bill, but, on the contrary, ratified the order, we think both the appellant and the court were bound by the terms of the original order, and that good faith required a decree substantially as passed by the circuit court. The following cases furnish full support to this view: Miltenberger v. Railway Co., 106 U. S. 286, 1 Sup. Ct. 140; Union Trust Co. v. Illinois M. Ry. Co., 117 U. S. 434, 6 Sup. Ct. 809; Kneeland v. Luce, 141 U. S. 491, 12 Sup. Ct. 32. Many other adjudications could be cited if it were worth while to cumber the record.

The decree appealed from is affirmed.

SPEER, District Judge (dissenting). Regrettably for myself, I have not been able to reach the conclusions attained by the majority of the court in this case. Deference and respect for my learned brethren seem to require that I should state the considerations which have prevented a coincidence of opinion with them.

The first mortgage bondholders of the Marietta & North Georgia Railroad Company had a security which seemed to them adequate for their investment in the bonds of the company. This was the property of that railroad, within the state of Georgia. The road extended from Marietta to the Georgia line. These bonds amounted to only $680,000. It was, when the bonds were purchased, a narrow-gauge road, but the region which it penetrated is noted for its rapidly developing wealth of field, forest, and mine; its immense deposits of variegated and beautiful marble; for its romantic charm of scenery and for its healthful climate. Its future seemed propitious. For nearly 10 years there was no default on these bonds. In 1887, however, a scheme was formed to enlarge and extend this road; to give it a broad gauge; and by traversing a mountainous country, and bridging numerous rivers,—among them, the Tennessee,—to reach the city of Knoxville. In furtherance of this project the road itself was consolidated with the Georgia & North Carolina Railroad Company of North Carolina, and the new corporation, under the name of the Marietta & North Georgia Railway Company, issued what are termed its "consolidated bonds," to the amount of $3,821,-000. The Central Trust Company of New York became trustee for these bondholders. It was a part of the scheme for the new trunk line that the holders of the first mortgage bonds, amounting to $680,-000 of face value, and the holders of a second issue of $480,000, should exchange these securities for the consolidated bonds of the railway company. Practically all of the second mortgage bondholders did this, and all of the first mortgage bondholders likewise, except the holders of 382 bonds of $1,000 each. These bonds so exchanged are now held by the Central Trust Company as collateral security for the consolidated bonds. The holders of 382 of the first mortgage bonds, and the Boston Safe-Deposit & Trust Company, the trustee for the first and second mortgage bonds, had nothing to do with the scheme for the new railway to Knoxville. They were not parties to any proceeding with that purpose in view. As I think they had the right to do, they relied upon the security of their bonds, namely, the productive property of the railroad in Georgia. Their

security seemed unassailable. The consolidated mortgage under which the new millions of bonds were issued in express terms recognized that it was subordinate to the first mortgage bonds. The consolidation took effect on the 1st day of January, 1887, but the first mortgage bondholders did not take part in it, and were not affected by it. There was as yet no default on their interest. On the 12th of January, 1891, the Central Trust Company filed its bill to foreclose the consolidated bonds. This bill was filed against the new Marietta & North Georgia Railway Company. It had no averments in it affecting the 382 bonds of the Marietta & North Georgia Railroad Company, whose holders had not exchanged them for the securities of the new company. The old company was not made a party, although, as a legal entity, it still existed. The trustee of these outstanding bonds, the Boston Safe-Deposit & Trust Company, was at this time in no wise connected with the suit, either as a plaintiff or as a defendant, nor were any of the holders of these bonds. A receiver was appointed, and proceeded to carry out the purpose of that bill. That purpose was plainly to aid a plan of reorganization in the interest of the holders of the consolidated mortgage bonds, and, as we have seen, to extend the road to Knoxville, make it a through trunk line, and build an expensive bridge over the Tennessee river. It may be observed at this point that a scheme for reorganization of corporation property must either be effected by the consent of the security holders, or by providing for the payment and discharge of the obligations they hold, or by a judicial proceeding giving to each creditor the right to which, under all the circumstances, his lien or claim entitles him. It cannot be accomplished by a majority of the security holders. Any one may stand on his legal rights, and the court is bound to protect them. Courts may, and frequently do, encourage plans of reorganization; but they cannot, in a compulsory way, reorganize objecting securities out of existence because a majority of the creditors desire it. This important fact in this case should also be observed. The court did not undertake, as courts may do, merely to keep the insolvent railroad a going concern, but, through its receiver, undertook to build, improve, enlarge, and extend a new railroad, of which the primary investors never dreamed when their bonds were issued. The complainant was in effect a promoter, and the court, by its receiver, a builder, of a new road, of a very expensive character, traversing the territory of two states other than that in which the property originally pledged for the first mortgage bonds was located. In the case of Shaw v. Railroad Co., 100 U. S. 613, the supreme court declared:

"The power of the courts ought never to be used in enabling railroad mortgagees to protect their securities by borrowing money to build intervening roads, except under extraordinary circumstances. It is always better to reorganize the enterprise on the basis of existing mortgages as stock, or something which is equivalent, and by a new mortgage with a lien superior to the old, to raise money which is required, without asking the courts to engage in the business of railroad building."

In furtherance of the project above mentioned, the receiver was authorized to buy a large amount of rolling stock and other equipment, and to contract for building the bridge before mentioned over

the Tennessee river. The debts incurred by the receiver were not paid. The road in Georgia on which the first mortgage bonds were placed may have been fairly productive, but the new scheme was a chimera. The parties who furnished the rolling stock, and the contractor who built the bridge, filed their interventions, for the purpose of obtaining judgments on their claims; and these were referred to a special master, who reported that they were liens of the highest dignity, and should be paid. The Central Trust Company, complainant in the original bill, usually filed exceptions; but they were all overruled, and the circuit court confirmed the reports. These interventions each possessed all of the characteristics of a separate suit, and in its decree on each the circuit court proceeded to ascertain, and fix by formal decrees, the amount due, and also the dignity and priority of the lien, as compared with the other liens upon the property. This action on the part of the court, I think, as will be presently seen, was conclusive, as affecting the issues now presented to this court. Upon the intervention of S. W. Groome for the price of freight cars, on which a decree was rendered on the 3d of July, 1891, the court expressly held that the lien of the intervenor was "superior to the mortgage represented by the Central Trust Company of New York." Not only is this true, but, the intervention having been appealed to this court, the judgment of the court below was adopted literally, and in its entirety. This appears by the mandate of this court made the 14th day of December of the same year. On the intervention of the Jackson Woodin Manufacturing Company, a decree rendered July 6, 1891, again fixes the lien as "superior to the mortgage represented by the Central Trust Company of New York." This judgment, also, in its literal entirety, was affirmed by this court. Precisely the same holding was made by the circuit court on the intervention of the Rhode Island Locomotive Works, and on the intervention of the Jackson-Sharp Company. Both interveners sued for the price of equipments. When another intervention of S. W. Groome for car trucks was presented to the circuit court, a decree in his favor for $22,500 was rendered, directing the receiver to give Groome a note being a first lien on the property in the hands of the receiver, "superior to the lien of the mortgage represented by the Central Trust Company." On appeal this court reduced the amount of the claim to $5,500, but did not alter the rank of the lien as fixed by the circuit court. By the mandate the receiver was directed to pay this sum to Groome within 15 days, and in case of his inability to do so the receiver was directed to redeliver the property purchased. The receiver did neither, whereupon the circuit court issued an order fixing the lien of Groome as superior to the consolidated mortgage, and also to the first mortgage. This order seems to have been made by the court, sua sponte, in June, 1895, and without any pleadings seeking the promotion of a lien given its rank by the circuit court in 1891, and affirmed by this court in 1892. Many terms had intervened. On the intervention of George Eager, the master reported that $2,276.75 was due; and the court, no doubt inadvertently, gave the decree for $3,276.75, and declared it to be "a first lien on all property of said railway com-

pany." This order was not taken until the 4th of July, 1892. With the exception, then, of this decree, and the S. W. Groome $5,500 decree, all of these judgments were judicially declared to be a lien "superior to the mortgage represented by the Central Trust Company;" namely, the consolidated mortgage. They were final judgments, even where they did not receive the additional sanction of the affirmance by this court. Central Trust Co. v. Grant Locomotive Works, 135 U. S. 207, 10 Sup. Ct. 736. They were final, then, not only as to the amount, but as to the dignity of their respective liens. If they had not been final, they could not have been appealed from. When, therefore, the court fixed the lien of these several decrees on as many separate interventions to be superior to the lien of the mortgage represented by the Central Trust Company, that being the third mortgage, it was judicially declared that they were inferior to the lien of the first mortgage represented by the Boston Safe-Deposit & Trust Company. "Expressio unius est exclusio alterius." With relation to the receiver's certificate to build the bridge across the Tennessee river, it is true that in the order authorizing the issue of the certificate it is recited that it shall be the first lien on the whole Marietta & North Georgia Railway Company, extending from Marietta, in Georgia, to Knoxville, in Tennessee. This, I submit, should not affect the rights of the holders of the first mortgage bonds who took no part in the project of which the bridge was an instrumentality, and the lien of whose bonds is restricted to the property in Georgia, and who at the time of the order authorizing the certificates, the 9th of December, 1891, were neither themselves, nor by their trustees, parties to the bill. They were given no opportunity to appear, or to be heard on the evidence as to the propriety of this expenditure. They had not their day in court. This right, under the circumstances, should have been afforded them. It cannot be doubted that if this was a question of necessary repairs to the railroad pledged to secure their bonds, or even to complete an uncompleted portion thereof, or to procure the necessary rolling stock, or to prevent the deterioration of the property, the power of the court to issue the certificate without prior notice to the bondholders would be recognized. Such power is always, however, to be exercised with great caution; but having changed the gauge of the road, having extended it more than 100 miles through another state, without the consent of the outstanding bondholders, then, without giving the latter an opportunity to be heard on the evidence as to the propriety of the expenditures, and the postponement of their liens, an outlay of $130,000, by which they could never be benefited, was, in my judgment, unwarrantable, as against their interest.

Reliance is had on the cases of Wallace v. Loomis, 97 U. S. 146, and Miltenberger v. Railroad Co., 106 U. S. 286, 1 Sup. Ct. 140,—to support the priority which, without any notice to them or their trustee, the original order gave to these certificates. But in Wallace v. Loomis the bill was filed by the trustees of the first mortgage. It followed that all expenditures made by the receiver for necessary improvements for the preservation and management of the property were superior to the liens of those bondholders who had imposed

that duty upon the court. In that case, also, the second mortgagees, whose trustees likewise objected, had due and legal service of the application to issue certificates, and made no objection. The court held that the bondholders were bound by the nonaction of their trustees, who were parties. In the case of Miltenberger v. Railroad Co., supra, the first mortgagees had appeared and answered, and were therefore parties to the record. In this case, as already stated, at the time this order was issued neither the bondholders nor their trustees had any connection with the litigation, but were relying upon the fact that the consolidated mortgage made for the purpose of extending the road was expressly subordinate to theirs; and they had the right to conclude that the court would do as to future expenditures, for completing and equipping the new road, as it had done with those past, and would give a lien superior only to the lien of the consolidated mortgage. I think that the circuit court itself must have recognized the inequitable character of the order making the bridge certificates superior to the first mortgage bonds, and attempted to correct it in the final decree. In the most important proviso of that decree, which relates to this matter, it is declared "that the receiver's certificates issued, or to be issued, for the construction of the bridge and approaches over the Tennessee river at Knoxville, Tennessee, aggregating not more than $160,000, are to be a charge solely on the line of the railway in the state of Tennessee." This decree was entered on the 13th of May, 1893, and it was the final decree. This is true both as matter of law, and by its own terms. It finally disposed of all matters, except certain questions that it submitted to the standing master, in which submission the court makes the reservation above quoted, and thus itself judicially declares that the bridge certificates have a lien solely on the line of railway property in Tennessee. The bill had accomplished its purpose, and was final as to the relief prayed for. See Forgay v. Conrad, 6 How. 204; Ex parte Norton, 108 U. S. 242, 2 Sup. Ct. 490; Thomson v. Dean, 7 Wall. 342; Iron Co. v. Meeker, 109 U. S. 181, 3 Sup. Ct. 111. The holders of the bridge certificates might have appealed from the decision restricting their lien to the property in Tennessee, and it was therefore final as to them. Central Trust Co. v. Grant Locomotive Works, 135 U. S. 207, 10 Sup. Ct. 736; Central Trust Co. v. Florida Ry. & Nav. Co., 43 Fed. 751. As the bill of the Boston Safe-Deposit & Trust Company had been previously filed and consolidated with the original bill, it was a party to the decree. The decree, then, was final as to that party, also, and therefore final as to outstanding bondholders whom it represented. During the term at which this decree was passed, the court, even on its own motion, might have amended, corrected, or vacated it. Henderson v. Coke Co., 140 U. S. 40, 11 Sup. Ct. 691. But after the term has passed the court could not vacate or amend the decree, as to the priority of the receiver's certificates. Brooks v. Railroad Co., 102 U. S. 107. An amendment after the first term is not simply irregular; it is void. Glenn v. Dimmock, 43 Fed. 550.

The case of Central Trust Co. v. Grant Locomotive Works, 135 U. S. 207. 10 Sup. Ct. 736, is precisely in point, both as to this and

the other decrees fixing the lien of equipment claims. There it was held, on an intervention filed in a suit for foreclosure of a railroad mortgage, that locomotive works furnishing engines in the possession of the receiver, and in use, were justly entitled to priority over the bonds secured by the mortgage, and that such holding was a final decree upon a matter apart from the general subject of litigation, and could not be vacated by the court after the expiration of the term at which it was granted. A fortiori was such an adjudication in a final decree for or against a particular claim conclusive, and beyond the power of the court to alter it at a subsequent term. Now it is true in this case that at a term subsequent to that in which the final decree was passed, and more than two years thereafter, on four days' notice, the court made its decree changing the rank of the judgments which it had theretofore granted. The liens on the receiver's notes for rolling stock and equipments were now declared to be superior, not only to the bonds "represented by the Central Trust Company," but to the bonds represented by the Boston Safe-Deposit & Trust Company. The bridge certificate was also accorded a rank superior to that of the first mortgage bonds, and extended to the entire property, including that in Georgia as well as in Tennessee. This new view of the situation simply obliterated the security of the first mortgage bondholders, and I think was erroneous. The holding the court originally made on the several interventions, and in its final decree, was correct, substantially; and if it unfortunately turned out afterwards that there was not enough of value in the hands of the receivers to protect the first lien of the outstanding first mortgage bondholders, and also the indebtedness created by the receiver, the equities of the parties were not to be altered on this account, especially in view of the general character of the receivership. I am of the opinion that the outstanding 382 first mortgage bonds are entitled to the first claim on the property in Georgia, and to such a share in the proceeds of the equipment as will be fairly proportioned to equipment originally pledged to secure their bonds. Although their mortgage pledges after-acquired property, I do not think they are entitled to share in the property afterwards acquired by the receiver for the purpose of carrying out the project of the new line to Knoxville; and it is conceded that they have no lien on the property in Tennessee, or on the bridge and its approaches. And, further, I think that the Central Trust Company, having become, in furtherance of the extension scheme, the trustee for the consolidated mortgage bonds, and having taken as collateral security $777,000 worth of the first and second mortgage bonds of the Marietta & North Georgia Railroad Company, is subrogated only to the rights of the holders of those bonds so exchanged. And since those holders themselves entered upon the scheme to build a new railroad with the knowledge and approval of the Central Trust Company, their bonds exchanged for an equal number of the consolidated bonds issued in pursuance of such schemes are either merged in the new bonds, or have no greater dignity in the hands of the company than the consolidated bonds, and are therefore not entitled to a greater share of the proceeds of

the sale than the consolidated bonds themselves.    This is especially true in view of the fact that the Central Trust Company, representing the consolidated bonds, brought the bill under which the expenses of the receivership were incurred, as its counsel admits in judicio, for the purpose of furthering the reorganization.    I am further of the opinion that the supplementary decree of June 8, 1895, appealed from, and other decrees thereafter taken, in so far as they tend to change the judgment on the several interventions, or the dignity of the liens, where fixed by the final decree of May 13, 1893, are void, and that the outstanding bondholders are in no sense responsible for embarrassments which have grown up under such subsequent decrees.    Nor do I think that these bondholders of the Boston Safe-Deposit & Trust Company were in any sense in laches. They were doubtless aware that the court was managing the property under the bill of the Central Trust Company, but, no matter how closely they might have scrutinized its action, they would have discovered that it was creating debts superior only to the lien of the Central Trust Company, and therefore subordinate to their outstanding bonds.    They had the right to conclude from this action of the court, and from the action of the circuit court of appeals affirming the same, that their interest under the first mortgage bonds would have been carefully conserved.    The decree of June 8, 1895, having been appealed from, no subsequent decree reaffirming its purport was of any effect; and the decree of May 13, 1893, having declared the bridge certificates to be a charge solely on the line in Tennessee, not having been appealed from, the decree of October 13, 1895, authorizing the purchasers of the entire road to turn in bridge certificates as cash, is utterly null and void, and the purchaser took no right under it, and is not bound by it.    If it be true, as stated dehors the record, that the property is now sold on these terms, either the sale should not be confirmed, or, if confirmed, the order of confirmation should be revoked.

When the bill of the Boston Safe-Deposit & Trust Company was filed, the usual order in respect to the proceedings of the court theretofore had was taken.  This merely ratifies the management generally, and does not purport to ratify particular liens.    This did not inhibit the Boston Safe-Deposit & Trust Company, and the bondholders it represented, from insisting that their bonds were superior to the lien of the certificates which had been authorized when they were not parties; and surely, as to their bonds, the rank of those certificates was still to be determined by the court.    The case of Kneeland v. Luce, 141 U. S. 508, 509, 12 Sup. Ct. 32, does not conflict with this view.    In that the case of the bondholders who objected to the priority of the receiver's certificates were by their trustee made parties to the suit in which the decree was rendered, and the court expressly held that they consented to the issue of the certificates. From the master's report, it appeared that, in the proceedings under the petition to issue the certificates, all parties in interest were duly represented.    The fact that the first mortgage bondholders, then, were represented by their trustee as fully and fairly as such trustee was by law authorized to represent them, bound them by this action.

After full hearing and consideration the court made the decree, that upon these facts and the consent of the trustees the issue of the certificates was binding upon every bondholder, and under all the circumstances of the case the bondholders were precluded from claiming priority over the receiver's certificates which were issued for the purpose of preserving mortgaged property.    It is superfluous to repeat that no such conditions appear from the record before this court, and the upshot of this case is to wipe out, by proceedings to which they were never parties, over $382,000 invested in good faith in the bonds of the narrow-gauge railroad by its first creditors, and to inflict this loss upon them because of the ambition existing with other people, elsewhere, to build another and a broad-gauge railroad in other and different states,—an enterprise in which they were never concerned, and from which it is plain they could have received no benefit whatever.    For these reasons I think that the judgment of the court should be reversed, with instructions.

EQUITY PRACTICE—PARTIES BOUND BY ORDER—PRIORITY OF LIENS.

The M. Railroad Company, owning a line of railroad in Georgia, made two mortgages of the same to the B. Trust Co. to secure issues of bonds. Subsequently it was consolidated with another railroad company, owning a line in North Carolina, to form the M. Railway Company which made a mortgage on the whole line to the C. Trust Co., to secure another issue of bonds which were used in part to extend the road into Tennessee.   The railroad company defaulted on all the bonds, and the C. Trust Co. commenced a suit to foreclose its mortgage, in which a receiver of the road was appointed.   Interventions were filed by various parties, claiming liens on parts of the rolling stock, and the receiver also applied for authority to purchase additional rolling stock necessary for the operation of the road.   After investigation by a special master, and with the approval of a committee of bondholders, representing both bonds under the C. Trust Co. mortgage and bonds of the underlying mortgages, orders were made directing the receiver to purchase the rolling stock on which the liens were claimed and the new rolling stock, and to give notes and issue receiver's certificates therefor, which should be a first lien on the whole of the M. Railway Co. property.   After the making of such orders, the B. Trust Co. commenced a suit for the foreclosure of its mortgages, obtained the extension of the receivership to its suit, and caused an order to be entered directing that the receiver should conform to all the requirements and orders previously imposed upon him in the C. Trust Co.'s suit.   The two foreclosure suits were consolidated.   Subsequently, the B. Trust Co. appealed from a decree of foreclosure and sale which adjudged priority to the notes and certificates so issued over all the mortgages, claiming that, as the orders authorizing the same were made before it became a party to the suit, priority over its mortgages could not be given, although it claimed the benefit of the rolling stock purchased with the notes and certificates, and had made no offer to have the same surrendered to the holders of the notes and certificates.   *Held,* that the B. Trust